Ronald A. MILLER, Sr., Administrator of the Estate of Ronald Miller, Jr., Appellant (at 903)

v.

The BRASS RAIL TAVERN, INC. and Thomas E. McMaster.

Ronald A. MILLER, Sr., Administrator of the Estate of Ronald Miller, Jr.

v.

The BRASS RAIL TAVERN, INC. and Thomas E. McMaster.

Appeal of the BRASS RAIL TAVERN, INC. (at 956).

Superior Court of Pennsylvania.

Argued June 19, 1997.
Filed Oct. 21, 1997.

Robert Lugg, Lock Haven, for Miller.

Paul D. Welch, Jr., Lock Haven, for the Brass Rail Tavern, Inc.

J. David Smith, Williamsport, for McMaster.

Before TAMILIA and HUDOCK, JJ., and CERCONE, President Judge Emeritus.

CERCONE, President Judge Emeritus.

These are appeals from the judgment entered following a bench trial in the Court of Common Pleas of Clinton County. We vacate that judgment and remand this matter for further proceedings.

In 1989, Ronald A. Miller, Sr. (Miller), as Administrator of the Estate of Ronald A. Miller, Jr. (decedent), commenced this action against the Brass Rail Tavern, Inc. and its sole shareholder, Thomas E. McMaster. Miller alleged that the Brass Rail wrongfully had served alcoholic beverages to decedent who visibly was intoxicated. After leaving the Brass Rail, decedent was killed in a one-vehicle accident.

In 1992, at the original trial in this matter, the court determined that the Brass Rail had served decedent while he visibly was intoxicated. Nevertheless, the court found that Miller failed to prove that this negligence was a substantial factor in bringing about decedent's death because Miller had not established that the accident occurred close enough in time after the Brass Rail had served the visibly intoxicated decedent. On appeal, a panel of this Court affirmed the trial court's determination. *See Miller v. Brass Rail Tavern, Inc.*, 434 Pa.Super. 383, 643 A.2d 694 (1994) (with one judge, Wieand, J., dissenting). However, our Supreme Court granted *allocatur* and reversed this Court's decision; the matter was remanded for a new trial. *See Miller v. Brass Rail Tavern, Inc.*, 541 Pa. 474, 664 A.2d 525 (1995).

On remand, the parties agreed that trial would be limited to when the accident and decedent's death occurred, and the court incorporated the evidence and findings from the previous trial, except for evidence relating to the time of death. Following a non-jury trial, the court rendered a verdict in favor of Miller and against the Brass Rail in the amount of $210,000. Also, with respect to Miller's claim against McMaster as sole

stockholder of the Brass Rail, the court refused to pierce the corporate veil, finding in favor of McMaster.

Miller filed a motion for delay damages and a motion for post-trial relief. The Brass Rail also filed a motion for post-trial relief. By order dated September 11, 1996, the court awarded Miller approximately $100,-000.00 in delay damages. In separate orders dated November 5, 1996, the court denied the post-trial motions filed by Miller and the Brass Rail. On November 12, 1996, judgment was entered reflecting the court's initial damage forward against the Brass Rail as well as its award of delay damages.

On November 18, 1996, Miller filed a notice of appeal. The Brass Rail later filed a cross-appeal. We will treat these appeals separately, addressing Miller's appeal first. Initially, however, we note that

> [t]he role of an appellate court reviewing the trial court's final judgment is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in the application of law. The findings of the trial judge in a non-jury case must be given the same weight and effect on appeal as a verdict of a jury and will not be disturbed on appeal absent error of law or abuse of discretion. When this court reviews the findings of the trial judge, the evidence is viewed in the light most favorable to the victorious party below and all the evidence and proper inferences favorable to that party must be taken as true and all unfavorable inferences rejected.

*Guttman Oil Co. v. Pennsylvania Insurance Guaranty Association,* 429 Pa.Super. 523, 527–28, 632 A.2d 1345, 1347 (1993), *appeal denied,* 537 Pa. 663, 644 A.2d 1200 (1994) (citations omitted).

### Miller's Appeal Docketed at No. 903 Harrisburg, 1996

Miller presents this Court with the following three questions, which we have renumbered for review purposes:

1. Did the trial court abuse its discretion by finding the [Brass Rail] was adequately capitalized[?]

2. Is gross undercapitalization of a corporation owned by one stockholder sufficient reason to pierce the corporate veil[?]

3. Did the trial court abuse its discretion in failing to find the [Brass Rail] and [Mr. McMaster] intermingled their interests[?]

Brief for Appellant Miller, at 5.

■ Each of these claims relates to Miller's attempt to pierce the corporate veil of the Brass Rail and hold McMaster liable for the Brass Rail's negligence. In Pennsylvania, there is a strong presumption against piercing the corporate veil. *Lumax Industries, Inc. v. Aultman,* 543 Pa. 38, 41, 669 A.2d 893, 895 (1995). The *Lumax* Court recognized that the following factors should be considered when determining whether to disregard the corporate form: undercapitalization; failure to adhere to corporate formalities; substantial intermingling of corporate and personal affairs; and the use of the corporate form to perpetrate a fraud. *Id.* at 42, 669 A.2d at 895.

■ First, Miller complains that the court abused its discretion by finding the Brass Rail to be capitalized adequately. The evidence showed that the Brass Rail was incorporated in April 1987, with McMaster as its sole shareholder. N.T. 5/12/92, at 95–96. He paid $1,000 for ten shares of stock in the Brass Rail. N.T. 5/14/92, at 96. McMaster paid a total purchase price of $100,000 for the licensed establishment and additional real estate. N.T. 5/12/92, at 98. This purchase price can be broken down as follows: $44,000 for the building housing the tavern; $6,000 for land; $25,500 for an apartment building located on an adjoining lot; $8,500 for inventory; $13,000 for the liquor license; and $3,000 for goodwill. *Id.* Thus, the real estate involved in the transaction comprised $75,500 of the purchase price. The Brass Rail received the assets that comprised the balance of the purchase price. In exchange, a note for $24,500 was given by the Brass Rail to McMaster. *Id.* at 107. This $24,500 was treated as a loan from McMaster to the Brass Rail. N.T. 5/15/92, at 31. McMaster and the Brass Rail then executed a lease agreement whereby McMaster leased the premises housing the tavern to the Brass

Rail for $400 per month. N.T. 5/12/92, at 108.

The record further reflected that, because of the nature of the tavern business, the Brass Rail operated on a cash basis; credit is not available for tavern owners to purchase liquor. N.T. 5/15/92, at 34–35; N.T. 5/12/92, at 38. The capital needs of a tavern are low. N.T. 5/15/92, at 35; N.T. 5/12/92, at 38. Capital is needed to obtain the initial inventory for the tavern, but as that inventory is sold, the tavern should have sufficient cash to replenish it. N.T. 5/15/92, at 35.

Gregory Dwulet, a certified public accountant, testified as an expert in accounting. N.T. 5/14/92, at 31, 34. Mr. Dwulet rendered business advice to both McMaster and the Brass Rail. *Id.* at 36. Mr. Dwulet opined that the Brass Rail was capitalized adequately for purposes of its operation. *Id.* at 38–39, 82. Additionally, Eugene Cox, another certified public accountant that performed services for McMaster and the Brass Rail, also testified that he believed that the Brass Rail, at all times, was capitalized appropriately. N.T. 5/14/92, at 126, 128, 133. The trial court rejected Miller's claim that the Brass Rail was undercapitalized. When this Court reviews the record in the light most favorable to McMaster as the victorious party below, we find that the trial court's determination is supported by competent evidence. *See Guttman Oil Co., supra.*

Miller next asserts that gross undercapitalization of a corporation owned by one stockholder is sufficient reason to pierce the corporate veil. Because we already have determined that the trial court correctly concluded that the Brass Rail was not undercapitalized, we can grant Miller no relief on the basis of this claim.

■ Lastly, Miller argues that the trial court abused its discretion in failing to find that the Brass Rail and McMaster intermingled their interests. The trial court made the following findings relative to Miller's assertion of intermingling:

> During the course of the first year or two of operation, it was discovered by the Brass Rail's accountant that the payment of certain obligations was not being handled properly by the Brass Rail and McMaster's other business ventures.
>
> These discrepancies occurred basically in two areas. The first related to the Brass Rail's making mortgage payments for real estate when the legal obligation to do this was clearly on McMaster. In addition, there were certain employees of McMaster's real estate concern who were also employed by the Brass Rail Tavern. It was discovered that McMaster's real estate business was improperly paying parts of the salaries of these employees, and when this was discovered the Brass Rail was required to reimburse MET Enterprises, the name under which McMaster was doing business individually. While [Miller] has questioned these transactions, the [c]ourt accepts McMaster's explanation as to what occurred. It would further appear that these discrepancies upon being discovered were corrected and the appropriate reimbursements to each of the parties was made.
>
> It is of some significance that these misadventures occurred prior to the date of the alleged tort in this case which tends to lend some credibility to the explanations offered for them. In other words, the explanations and corrected courses of action were not taken after the institution of this litigation.

Trial court opinion, dated 7/22/92, at 13–14. We note that questions of credibility and conflicts in evidence are for the trier of fact to resolve. *Adamski v. Miller*, 545 Pa. 316, 681 A.2d 171 (1996). This Court will not substitute its judgment based on a cold record for that of the factfinder where issues of credibility and weight of the evidence are concerned. *Kaib v. Smith*, 454 Pa.Super. 67, 684 A.2d 630 (1996). We have reviewed the record and find that the trial court's conclusion that there was not substantial intermingling of corporate and personal affairs in this case sufficiently is supported by competent evidence. *See* N.T. 5/14/92, at 95; N.T. 5/15/92, at 44–47.

### Brass Rail's Cross–Appeal Docketed at 956 Harrisburg, 1996

The Brass Rail contends that (1) Miller failed to prove that the Brass Rail served

decedent alcoholic beverages while obviously intoxicated and alternatively, (2) even if decedent was served while obviously intoxicated, Miller failed to prove that the service of alcohol was a substantial factor in causing decedent's demise. Further, the Brass Rail asserts that (3) decedent was contributorily negligent in operating a vehicle after the consumption of alcoholic beverages; (4) decedent assumed the risk of injury by operating his vehicle after consuming alcoholic beverages; and (5) even assuming the Brass Rail is liable, the trial court erred in calculating the delay damages that it awarded Miller.

■ The Brass Rail first argues that Miller did not prove that the Brass Rail served alcoholic beverages to decedent while he visibly was intoxicated. The record reflects that decedent met with Kevin Peters, Jay Martin, and Gary Styers at approximately noontime on July 8, 1989, and they decided to ride all-terrain vehicles (ATVs) on the Beech Creek Mountain. N.T. 5/11/92, at 32, 35, 75–76. The men then purchased a case of beer and an additional twelve-pack, or a total of 36 cans of beer, to take with them. *Id.* at 33–35. While riding ATVs, decedent may have consumed as many as nine cans of beer. *Id.* at 65–66. Around 9:30 that evening, the men returned from the mountain. *Id.* at 36. Later, Kevin Peters, Gary Styers and decedent went to Bobby's Place, a bar in Beech Creek. *Id.* at 37–38. Decedent drove his two friends to the bar in his Scout vehicle. *Id.* at 38.

The three men met up with Lori Miller, decedent's cousin, at Bobby's Place. *Id.* at 38, 137. There, decedent consumed an additional two beers. *Id.* at 58. The group, including Ms. Miller, next set out for the Brass Rail and, again, decedent drove. *Id.* at 38–39. They purchased a six-pack of beer, and each drank one beer en route to the Brass Rail. *Id.* at 38–39, 65–66, 80, 118. Upon arriving at the Brass Rail, each purchased a beer, and the group sat down at a table. *Id.* at 39, 81. Ms. Miller subsequently bought decedent another beer while at the Brass Rail. *Id.* at 119. Decedent left his friends at the table and went to the bar where he spent the rest of the evening. *Id.* at 41, 82. Kevin Styers stated that he saw decedent consume a "mixed drink." *Id.* at 82. At some point during the evening, decedent switched shirts with Neva Askey, a woman that he had been speaking with at the bar. *Id.* at 42, 83. After the last-call had been made, decedent left the Brass Rail and drove his vehicle to the front entrance of the tavern. *Id.* at 42. Decedent re-entered the tavern to retrieve his companions. *Id.* Gary Styers, Kevin Peters, and Lori Miller, along with Neva Askey, without hesitation, entered decedent's vehicle, and decedent prepared to drive off. *Id.* at 42, 87. Linda Shirk, decedent's live-in girlfriend, then parked her car behind decedent's vehicle, approached his vehicle, and opened the driver's-side door. *Id.* at 143, 149. She and decedent engaged in a brief argument; Ms. Shirk stated she knew right away that decedent was intoxicated because his words were running together and he was very loud. *Id.* at 149. Following the argument, decedent attempted to drive the group home, but he was unable to control the car, swerved as he drove, and nearly hit a parked car. *Id.* at 44–45, 85–87. Neva Askey immediately told decedent she wanted to be let out of the car. *Id.* at 86–87. Kevin Peters then told decedent that he wanted to drive, and decedent permitted him to do so. *Id.* at 45–46. Peters drove to his home in Beech Creek, arriving at approximately 2:15 a.m. *Id.* Decedent then drove Lori Miller and Gary Styers to Ms. Miller's home where he left them off. *Id.* at 46, 86.

At the trial in this matter, Lori Miller testified that, on the night in question, decedent was louder and more affectionate than he normally was, but that she did not believe his speech was slurred. *Id.* at 120, 137. She stated that she was unsure exactly how many drinks decedent consumed at the Brass Rail that evening. *Id.* at 141. Kevin Peters testified that he did not believe that decedent acted unusual or intoxicated at the Brass Rail. *Id.* at 41. Gary Styers stated that he believed decedent's behavior was typical. *Id.* at 83. However, both Peters and Styers admitted that they were intoxicated on the evening of July 8, 1989. *Id.* at 40, 86. Dr. Charles Winek, testifying as an expert toxicologist, indicated that when an individual is intoxicated, because of the resulting sensory impairment, he may have limited accuracy in

detecting intoxication in another. N.T. 5/12/92, at 86–87.

Additionally, Fred White, a salesman that sold auto part's to Miller's auto body shop testified that he knew decedent. *Id.* at 7–8. He further stated that he saw decedent on the evening of July 8, 1989, at the Brass Rail. *Id.* He indicated that he spoke with decedent and that decedent visibly was intoxicated. *Id.* at 10. White testified that decedent slurred his speech and that he was weaving back and forth. *Id.* Also, White stated that decedent spoke slowly "as if he couldn't put the words together that he wanted to say." *Id.* at 11–12.

The Brass Rail suggests, however, that White was intoxicated, and that "White's own condition made it impossible to accurately observe the condition of others...." Brief for Cross–Appellant Brass Rail at 20. Also, the Brass Rail alleges that White's testimony regarding the time that he was present at the Brass Rail contradicts the testimony of Lori Miller, Gary Styers, and Kevin Peters. *Id.* As a result, the Brass Rail argues that the trial court was precluded from relying upon White's testimony. *Id.*

The Brass Rail has failed to cite any evidence indicating that White was intoxicated. Our review of the record demonstrates that White was present in the Brass Rail on the evening of July 8, 1989. N.T. 5/12/92, at 8. White left the Brass Rail for a short period, went to "Assante's," and then returned to the Brass Rail. *Id.* at 8–9, 12–14. From the record, we cannot determine what type of business "Assante's" conducts. Nevertheless, we will assume that "Assante's" served alcoholic beverages. White's mere presence in two establishments that served alcoholic beverages does not, without more, prove that White was intoxicated. Here, however, there is no evidence, excepting White's presence at the Brass Rail and Assante's, that even suggests White was intoxicated. With respect to White's testimony regarding the time that he was present at the Brass Rail, the record shows that White repeatedly stated that he

was not sure of the time frame. N.T. 5/12/92, at 12, 14, 15, 18. Moreover, once again, we point out that it was within the sole province of the trial judge as factfinder to resolve questions of credibility and conflicts in evidence and to weigh the evidence. *See Adamski and Kaib, supra.* Thus, contrary to the Brass Rail's assertion, the trial court was not precluded from relying on White's testimony. Based on our review of the record, we conclude that the trial court's finding that the Brass Rail served alcoholic beverages to decedent while he visibly was intoxicated sufficiently is supported by competent evidence.

 Next, the Brass Rail asserts that, even if decedent was served while obviously intoxicated, Miller failed to prove that the Brass Rail's service of alcohol to decedent was a substantial factor in causing his demise. A violation of the Dram Shop Act[1] is negligence per se. *Holpp v. Fez, Inc.,* 440 Pa.Super. 512, 656 A.2d 147 (1995). However, the breach of the statutory duty to refrain from serving alcohol to visibly intoxicated persons does not, by itself, prove a defendant's liability. *Id.* "Even if a patron has been served alcoholic beverages while visibly intoxicated, there will be no civil liability imposed upon the tavern keeper unless the injuries to the patron ... were proximately caused by the patron's intoxication." *Id.* at 518, 656 A.2d at 150. Proximate cause exists where a defendant's wrongful conduct is a substantial factor in bringing about plaintiff's harm. *Dudley v. USX Corp.,* 414 Pa.Super. 160, 606 A.2d 916, *appeal denied,* 532 Pa. 663, 616 A.2d 985 (1992). Proximate cause will not be found when the causal chain of events resulting in plaintiff's injury is so remote that it seems highly extraordinary that defendant's conduct caused the harm. *Id.* Thus, in this case, if decedent's accident and death occurred shortly after he dropped off his friends in Beech Creek at approximately 2:30 a.m., the causal chain of events resulting in decedent's death is closely connected with the Brass Rail's negligent conduct. However, if there was a significant

---

1. Section 4–493 of the Liquor Code makes it unlawful "for any licensee ... or any employe, servant or agent of such licensee ... to sell, furnish or give any liquor or malt or brewed beverages, or to permit any liquor or malt or brewed beverages to be sold, furnished or given, to any person visibly intoxicated...." 47 P.S. § 4–493(1).

time lapse after decedent dropped off his friends until his accident and death, the nexus between the Brass Rail's negligent conduct and decedent's demise becomes so remote that the Brass Rail's conduct cannot be a substantial factor in bringing about decedent's death. *See Vattimo v. Lower Bucks Hospital, Inc.,* 502 Pa. 241, 465 A.2d 1231 (plurality) (citing Restatement (Second) of Torts and recognizing time lapse as important consideration in ascertaining whether negligent conduct is a substantial factor in causing harm); *Hicks v. Metropolitan Edison Co.,* 665 A.2d 529 (Pa.Cmwlth.1995), *appeal denied,* 544 Pa. 638, 675 A.2d 1253 (1996) (same).

The evidence shows that decedent, in an intoxicated state, left the Brass Rail with his friends at approximately 1:30 a.m. on July 9, 1989. N.T. 5/11/92, at 83. Decedent attempted to drive his friends home but, because he was too intoxicated to do so, Kevin Peters drove instead. *Id.* at 45. Peters arrived at his home in Beech Creek at approximately 2:15 a.m. *Id.* at 46. Decedent then drove Lori Miller and Gary Styers to Ms. Miller's home where he left them off. *Id.* at 86. Decedent indicated he wanted to go back to the Brass Rail, but Ms. Miller and Styers told him that he should go home instead. *Id.* This was the last time he was seen alive. There was no evidence that decedent or his companions drank alcohol during the trip home.

At 7:32 a.m., Matthew Boone, a paramedic, was dispatched to the scene of a vehicular accident on Route 150. N.T. 4/10/96 (Vol. I), at 66. The accident occurred on a clear, unobstructed, straight portion of the roadway. *Id.* at 52. Boone arrived at the site at 7:35 a.m. and immediately placed a cardiac monitor on decedent which reflected no sign of life. *Id.* at 67. Boone observed that rigor mortis had set in decedent's body. *Id.* at 68. He also noticed livor mortis (gravitational settling of blood causing discoloration) on the extremities and trunk portion of the body. *Id.* Decedent was cyanotic, or blue in color, from the shoulders upward. *Id.* at 69. There was semi-dry blood on decedent's face. *Id.* Boone stated decedent's body was "cool" to the touch. *Id.* There were ten to twelve beer cans found at the scene of the accident. *Id.* at 74.

Additionally, Dean Wetzler, the Coroner of Clinton County during the time period at issue in this case testified as an expert. He stated he was notified of decedent's accident on July 9, 1989, at approximately 7:30 a.m. *Id.* at 24. Coroner Wetzler arrived at the scene at 7:50 a.m., and made an official pronouncement of death. *Id.* at 25–26. Coroner Wetzler noted that decedent had no pulse, his body was "cool" to the touch, "moderate" rigor mortis had set in and "there was a degree of rigidity" throughout the entire body. *Id.* at 26–28, 31. He also observed semi-dry blood on decedent's head and face. *Id.* at 27. Coroner Wetzler felt the hood of decedent's vehicle and it was cool indicating there was no heat coming from the engine. *Id.* at 28. He observed opened and unopened beer cans in and around decedent's car. *Id.* at 47. He testified that the environmental temperature at the time of the accident was 56 degrees.

Decedent's body was taken to the morgue where it was disrobed and a blood-alcohol specimen was withdrawn. *Id.* at 29. The temperature in the morgue was approximately 80 degrees. *Id.* at 54. Tests revealed decedent's blood-alcohol content at the time of death was .279, or nearly three times the legal limit. N.T. 5/12/92, at 45, 56. At 9:00 a.m., Coroner Wetzler took decedent's body temperature, and the thermometer indicated a temperature of 89.6 degrees. N.T. 4/10/96 (Vol.I), at 30. He again measured decedent's body temperature at 9:15 a.m., which indicated a temperature of 89.6 degrees. *Id.* Coroner Wetzler then utilized the following formula to determine the estimated time of decedent's death: normal body temperature (for purposes of the formula he used 98.4) less measured body temperature (89.6, in this case); the resulting figure is then divided by 1.5 which yields estimated hours since death. *Id.* at 30–31. Applying that formula, Coroner Wetzler determined that decedent had died approximately six hours prior to the time he had measured decedent's body temperature, *i.e.,* 9:00 a.m. less six hours. *Id.* Accordingly, Coroner Wetzler determined that decedent died at approximately 3:00 a.m.

*Id.* He indicated that he also considered rigor mortis, and that the degree of rigor mortis collaborated his estimated time of death. *Id.* at 7, 31. Coroner Wetzler testified that there is no means of accurately determining the time of death. *Id.* at 33. He stated that the time of death determined through use of the above formula is just an estimate and that the time may vary as much as two hours. *Id.* at 32–33.

Doctor Harold Cottle testified as an expert in the field of forensic pathology. N.T. 4/10/96 (Vol.II), at 6. He reiterated that time of death is not determinable precisely where there are no witnesses. *Id.* at 7. He stated that he typically does not utilize the formula that Coroner Wetzler used to determine decedent's time of death, but that he believed that it is a reasonable formula. *Id.* at 8. Dr. Cottle indicated that, to determine the estimated time of death, he considered the presence of rigor mortis and livor mortis as well as body temperature. *Id.* at 7, 10. He stated that the degree of rigor mortis of decedent's body as described by both Coroner Wetzler and Paramedic Boone would require at least a couple of hours or possibly more to develop. *Id.* at 12. Dr. Cottle opined that decedent died "not before 2:30 or 3 o'clock and probably not after 4 o'clock...." *Id.* at 16.

Dr. Cyril Wecht was also presented as an expert in forensic pathology. *Id.* at 30. Dr. Wecht again verified that there is no way to determine the precise time of death where a death is unwitnessed, but one can determine a window during which death may have occurred. *Id.* at 34–35. Dr. Wecht stated that he examines the following factors to determine the time of death in those cases where death is unwitnessed: rigor mortis; livor mortis; body temperature; vitreous humor, or the fluid in the back of the eye; body size; and the presence or absence of disease. *Id.* at 33. He testified that a violent, physically traumatic death such as decedent's can bring about the development of rigor mortis more quickly than a peaceful death. *Id.* at 35. Dr. Wecht indicated that there can be much variation in the determination of time of death when one uses a formula such as that used by Coroner Wetzler. *Id.* at 36–37. He

stated that changes in environmental temperature can effect determinations of time of death based on body temperature; a person's size and weight can also effect body temperature since thinner persons typically lose body temperature more quickly than do heavier persons. *Id.* 40–41. Dr. Wecht opined that decedent died sometime between 3:00 a.m. and 5:00 a.m. *Id.* at 44.

The Brass Rail submits that the court should accept Dr. Wecht's opinion over the opinions expressed by Dr. Cottle or Coroner Wetzler. Brief for Cross-appellant Brass Rail at 27. We again note that questions of credibility and conflicts in evidence are for the trial court sitting as factfinder, and we decline to substitute our judgment for that of the trial court where issues of credibility and weight of the evidence are involved. *Adamski, supra; Kaib, supra.* The Brass Rail also claims that there was no evidence indicating that decedent's accident was a result of his inability to control his vehicle because of his intoxicated state. We disagree. The record shows that decedent's accident occurred on a clear, unobstructed, straight portion of Route 150. Decedent's vehicle apparently left the roadway, sheared two trees in half causing substantial damage to the vehicle, and decedent's body was discovered partially out of the vehicle. N.T. 4/10/96 (Vol.I) at 67. These facts strongly suggest that decedent was unable to control his vehicle due to intoxication.

■ The trial court concluded that the Brass Rail's negligence was a substantial factor in causing the accident that resulted in decedent's death. Viewing the evidence in the light most favorable to Miller as verdict winner, the record shows that decedent visibly was intoxicated when he left the Brass Rail at 1:30 a.m. on July 9, 1989, that he dropped his friends off around 2:30 a.m., and, although the exact time of death cannot be determined, all experts believed that he may have died as early as 3:00 a.m. Based on the record before us, we cannot conclude that the causal chain of events resulting in decedent's death was so remote to appear highly extraordinary that the Brass Rail's negligent conduct caused decedent's accident and subsequent death. *Dudley, supra.* There was

sufficient evidence presented showing that there was no significant time lapse between the Brass Rail's negligent conduct and decedent's ensuing accident and death. Therefore, we find that the trial court properly concluded that the Brass Rail's negligence was a substantial factor causing the accident which led to decedent's death.

In addition, the Brass Rail maintains that Miller is precluded from recovering because decedent contributorily was negligent and that his negligence exceeds that of the Brass Rail. In *Congini v. Portersville Valve Co.*, 504 Pa. 157, 470 A.2d 515 (1983), a minor seriously was injured in an automobile accident following a party at which he was served alcoholic beverages to the point of intoxication. His parents filed a personal injury suit on his behalf, and on their own behalf, against the host of the party. The Supreme Court determined that the defendant/host was negligent *per se* for serving the alcohol to the point of intoxication to the minor, and that the host can be liable for injuries proximately resulting from the minor's intoxication. *Id.* at 162–63, 470 A.2d at 518. Nevertheless, the Court also concluded that the host may assert the minor's contributory negligence as a defense. *Id.* at 164, 470 A.2d at 518. Pursuant to the Comparative Negligence Act, 42 Pa.C.S.A. § 7102, the factfinder would then be required to resolve whether the negligence would allow recovery. *Id.* at 164, 470 A.2d at 519.

Subsequently, in *Matthews v. Konieczny*, 515 Pa. 106, 527 A.2d 508 (1987), our Supreme Court was faced with the issue of whether a commercial licensee of alcoholic beverages can be liable to a person injured as a result of service of alcohol to a minor. The *Matthews* Court concluded that a licensee can be held liable to third persons for damages proximately caused by the service of alcohol to a minor. *Id.* at 513, 527 A.2d at 512. Again, however, the Court, citing to its *Congini* decision, emphasized that the defendants can attempt to prove the comparative negligence of the minors involved. *Id.* at 114, 527 A.2d at 512.

 It makes no sense to permit a defendant to raise the contributory or comparative negligence of an intoxicated minor and yet prohibit a defendant from raising the contributory or comparative negligence of an adult especially when minors are presumed by our legislature to be incompetent to handle alcohol. *Congini*, at 161, 470 A.2d at 517, 18 Pa.C.S.A. § 6308 (prohibiting the purchase, possession, and consumption of alcohol by minors). In the present case, however, the trial court found that "any notion of contributory negligence ... on the part of [decedent] [is] so interwoven with the improper serving of alcoholic beverages that any negligence ... by [decedent] would hardly be the product of his own volition." Trial court opinion, dated 8/14/96, at unnumbered p. 5. This finding misinterprets existing caselaw by failing to hold decedent accountable for any acts of negligence on his part. Moreover, it was erroneous since it effectively prohibited the Brass Rail from raising and establishing the contributory negligence of decedent, an adult. The trial court went on to conclude that there was no evidence that decedent contributorily was negligent in the operation of his vehicle. *Id.* This conclusion clearly was based on the court's misinterpretation of the caselaw. This Court cannot assess decedent's contributory negligence based on a cold record. Therefore, we must remand this matter to allow the trial court to evaluate whether decedent's negligence, if any, bars recovery. *Congini, supra.*

Next, the Brass Rail contends that decedent assumed the risk of injury by operating his vehicle and, therefore, is precluded from recovering. The doctrine of assumption of the risk encompasses two separate concepts. The first category involves a finding that defendant had no duty to plaintiff and thus was not negligent. *Berman v. Radnor Rolls, Inc.*, 374 Pa.Super. 118, 132, 542 A.2d 525, 531 (1988). "No duty" cases frequently involve a possessor of land and a business invitee and establish that a possessor of land has no duty to protect the business invitee against known or obvious danger. *Id.* Cases that fall within this first category "place the burden of proof on the plaintiff since the duty of the defendant is an element of plaintiff's prima facie case." *Id.* at 133, 542 A.2d at 532. The second category, which

may be classified as the "assumption of the risk defense," involves cases in which a defendant owes a duty but may be relieved of liability because the plaintiff assumed the risk. *Id.* at 132, 542 A.2d at 531. Cases falling within this second category require that a defendant prove that plaintiff subjectively was aware of danger and yet voluntarily encountered it. *Id.* at 133, 542 A.2d at 532. To clarify,

> [a]ssumption of the risk contrasts with "no duty" cases in that assumption of the risk requires that the plaintiff subjectively understand the risk. "No duty" cases find a defendant not liable if a reasonable person in the position of the plaintiff would have recognized the danger, in addition to finding no liability where the plaintiff did in fact subjectively appreciate the danger. Assumption of the risk is an affirmative defense, to be pleaded and proved by the defendant ... rather than as a part of plaintiff's prima facie case.

*Id.* at 134, 542 A.2d at 532.

This Court, in *Herr v. Booten,* 398 Pa.Super. 166, 580 A.2d 1115 (1990), *appeal dismissed,* 532 Pa. 211, 615 A.2d 338 (1992), addressed an assumption of the risk claim that fell within the "no duty" category.[2] There, one day prior to Eric Herr's twenty-first birthday, his college roommates provided him with alcoholic beverages to celebrate. After consuming an exorbitant amount of alcohol, Herr died of acute ethanol poisoning. His parents later sued the roommates, alleging, among other things, that they were negligent in providing Eric with alcohol. The defendants, pursuant to the "no duty" theory, contended that Herr had assumed the risk of drinking an excessive amount of alcohol and thus they owed him no duty. The Court, citing *Congini, supra,* recognized that the defendants were negligent *per se* for providing Herr, a minor, with the alcohol. Therefore, the Court determined that it is pre-

sumed as a matter of law that defendants had a duty to Herr and that they breached this duty. As a result, defendants could not "employ an assumption of the risk analysis to defeat an element of the plaintiff's prima facie case which is established at the outset as a matter of law." *Id.* at 177, 580 A.2d at 1121.

■ As in *Herr,* in the present case, the Brass Rail was also negligent *per se.* Again, this negligence *per se* was a result of the Brass Rail's service of alcoholic beverages to decedent while he visibly was intoxicated. Similarly, the Brass Rail cannot utilize an assumption of the risk claim falling within the "no duty" category to defeat an element of Miller's case that is established as a matter of law by the Brass Rail's negligence *per se.*

■ Here, unlike in *Herr,* the Brass Rail also raises the "affirmative defense of assumption of the risk" under the second category described above. To be successful in this defense, the Brass Rail was required to prove that decedent subjectively was aware of the danger of driving and yet voluntarily encountered that danger. *Berman, supra.* The trial court found that decedent's decision to operate his vehicle was "a product of his intoxication," and the court therefore concluded that decedent did not assume the risk of operating his vehicle. Opinion, *supra,* at unnumbered p. 5. Implicit in the trial court's conclusion was a finding that decedent, as a result of his intoxication, subjectively was not aware of the danger of driving. As a result we find no error in the court's conclusion that decedent did not assume the risk of operating his vehicle.[3]

Lastly, the Brass Rail contends that the trial court erred in calculating the delay damages awarded to Miller pursuant to Rule of Civil Procedure 238. Specifically, the Brass

---

**2.** In a footnote, the Court indicated that the defendants had not pleaded the "assumption of the risk defense" theory.

**3.** At first glance, this conclusion may appear inconsistent with our decision to remand this matter to allow the trial court to reassess whether decedent contributorily was negligent. However, as stated, under the affirmative defense of

assumption of the risk, a defendant must prove that plaintiff *subjectively* was aware of danger whereas an *objective* standard applies to claims of contributory negligence, *i.e.,* a plaintiff is guilty of contributory negligence if he/she fails to exercise that degree of care which a reasonable person would exercise under the circumstances. *See* Summ.Pa.Jur.2d § 20:53.

Rail maintains that the court should have excluded from its calculation of delay damages that period of time when the case was appealed to the Superior and Supreme Courts. The Brass Rail asserts that this exclusion is justified because Miller filed the prior appeal after judgment was entered in the Brass Rail's favor.

■ Initially, we note that an appellate court will not disturb an award of delay damages pursuant to Rule of Civil Procedure 238 absent an abuse of discretion by the trial court. *Liberty v. Geneva College*, 456 Pa.Super. 544, 690 A.2d 1243 (1997).

> Rule 238 permits a successful plaintiff in certain civil actions to recover damages for delay, i.e., interest on the amount of his or her award. Pa.R.C.P. 238. The purpose of Rule 238 is twofold: "(1) to alleviate delay in the courts, and (2) to encourage defendants to settle meritorious claims as soon as reasonably possible." Pa.R.C.P. 238, 1988 Explanatory Comment, *citing Laudenberger v. Port Authority of Allegheny County*, 496 Pa. 52, 436 A.2d 147 (1981); *see also Craig v. Magee Memorial Rehabilitation Center*, 512 Pa. 60, 515 A.2d 1350 (1986).

*Arthur v. Kuchar*, 546 Pa. 12, 18, 682 A.2d 1250, 1253 (1996).

In *Arthur*, appellants asserted that the period after the jury had rendered a zero verdict in their favor until the trial court granted plaintiff a new trial should be excluded from the calculation of delay damages. In addressing this claim, the Supreme Court cited favorably Judge Aldisert's decision in *Barris v. Bob's Drag Chutes and Safety Equipment, Inc.*, 717 F.2d 52 (3d Cir.1983) setting forth the rationale for tolling delay damages during the appellate process:

> So long as the ultimate outcome of the case is reasonably in doubt the rule operates as an incentive for the defendant to consider seriously settlement as an alternative to a stalwart defense. Once the defendant obtains a favorable *final judgment* from the trial court, however, he has a reasonable basis to believe that the ultimate outcome is considerably less problematic. The defendant will quite rightly refrain from initiating any settlement activity and the bur-

den shifts to the plaintiff to perfect an appeal and to persuade the appellate court that reversible error occurred. At this point, we hold that the operation of Rule 238 no longer serves its purpose and should not be applied.

*Arthur*, at 22–23, 682 A.2d at 1255 (quoting *Barris*, 717 F.2d at 56–57) (emphasis added by *Arthur* Court). The *Arthur* Court then rejected appellants' attempt to equate the tolling of delay damages during a pending appeal from a final judgment with the tolling of delay damages after a jury rendered a zero verdict while a motion for a new trial is pending. *Id.* at 23, 682 A.2d at 1255. The Court reasoned that the outcome of a case remains "reasonably in doubt" following a jury verdict until the trial court enters a final judgment. *Id.*

■ In this case, following trial in 1992, a final judgment was entered in the Brass Rail's favor. As the *Arthur* Court recognized, once this occurred the outcome of the case was no longer reasonably in doubt. However, Miller then appealed and our Supreme Court granted him a new trial. During the pendency of that appeal, delay damages should not have been assessed against the Brass Rail because, having obtained a favorable final judgment, it could properly refrain from initiating settlement activity. Accordingly, the trial court erred in calculating delay damages to include that period during which this matter was last on appeal. Therefore, we shall remand this matter to allow the trial court an opportunity to recalculate delay damages.

In summary, the trial court determined that decedent did not assume the risk of operating his vehicle because, due to his intoxication, he did not subjectively understand the risk of injury. This the court could properly do. But, the trial court's determination that decedent could not have been contributorily negligent as a result of his intoxication was improper because we assess an individual's negligence on the basis of the "reasonable person" standard. Thus, we must remand this matter to allow the trial court to re-evaluate decedent's decision to operate his vehicle in an intoxicated state in

light of the degree of care that a reasonable person would have exercised in such a situation. Should the trial court determine that decedent contributorily was negligent, the court will next assess the relative proportions of the parties' negligence, whether decedent's negligence bars his recovery, and any appropriate diminishment of the damage award attributable to decedent's comparative negligence. Further, the court shall recalculate its delay damages award.

Judgment vacated. Case remanded for further proceedings consistent with this opinion. Jurisdiction is relinquished.