**Evans, Conger, Broussard & McCrea v. DiDomenico**

370

C.P. of Montgomery County, no. 06-04759.

*Gene A. Foehl*, for plaintiff.
*Michael H. Rosenthal*, for defendants.

MOORE, *J.*, November 30, 2010—

## I. FACTS AND PROCEDURAL HISTORY:

Evans, Conger, Broussard & McCrea (hereinafter "ECBM") is a full service insurance broker and insurance consultant. Sheila DiDomenico, operating through her company known as TinJam, Inc., is a former employee of ECBM. (NT, 10/21/09, pp. 106-107) From January 1, 1996 until March 2, 2004, DiDomenico was employed as a producer for ECBM. (NT, 10/21/09, pp. 106-107) As a producer, DiDomenico worked to acquire new insurance accounts for ECBM and serviced existing accounts. (NT, 10/21/09, p. 104-107) In exchange for her services, Sheila DiDomenico received a share of the commissions earned by ECBM for placing insurance on behalf of her clients. (NT, 10/21/09, p. 104-107)

On March 2, 2004, DiDomenico and ECBM terminated her original employment agreement and entered into two new inter-related agreements: a termination agreement and a house broker agreement. (NT, 10/21/09, pp. 133-34) These new agreements were intended to reflect DiDomenico's desire to retire from the full-time demands

of selling insurance and serve in a new role as a house broker. (NT. 10/22/09, p. 16-17)

Under the termination agreement, Sheila DiDomenico would sell her "book of business" to ECBM but continue to earn "deferred commissions" on certain accounts for a period of five years. (NT, 10/21/09, pp. 141-42); see Exhibit D-4, termination agreement dated March 2, 2004. The termination agreement separated her book of business into two groups, referred to as either "3250 accounts" or "3251 accounts." See Exhibit D-4, termination agreement, ¶ 4. 3250 accounts earned a commission at a rate of approximately four percent, whereas 3251 accounts earned a commission at a rate of 12 percent. See Exhibit D-4, termination agreement, ¶ 4.

ECBM also agreed to pay DiDomenico a fixed sum of money under the termination agreement in connection with the "premium billings" portion of her book of business. See Exhibit D-4, termination agreement, ¶ 4. These payments were referred to as "additional deferred commissions" and were expected to be paid over the course of five years in equal monthly installments. See Exhibit D-4, termination agreement, ¶ 4.

ECBM was permitted to discontinue the payment of deferred commissions and additional deferred commissions only if DiDomenico violated certain restrictive non-compete covenants in the termination agreement, which did not occur in this case.

In her role as a house broker, DiDomenico was not obligated to service any accounts for ECBM, but "would

continue to have prescribed use of the ECBM facilities with a view toward locating prospects and helping ECBM retain and expand its client base." See Exhibit D-4, termination agreement, ¶ 8. The house broker agreement specified that she was no longer an employee of ECBM and thus "had no obligation to work any particular hours or any particular amount of hours." See Exhibit D-5, house broker agreement dated March 2, 2004, ¶ 10. The house broker agreement generally sets forth commission figures to be paid for any new accounts produced (NT, 10/22/09, p. 16-17); see Exhibit D-5, house broker agreement, ¶ 3.

In January 2005, DiDomenico requested ECBM to include the Schmidt's Bakery account among the 3251 accounts under the termination agreement, thereby receiving a commission at a rate of 12 percent. (NT, 10/21/09, p. 193) ECBM declined the request and determined that the Schmidt's Bakery account belonged among the 3250 accounts for which DiDomenico would receive a commission at a rate of approximately four percent. (NT, 10/21/09, p. 197)

In August 2005, DiDomenico and ECBM further disagreed as to the classification of a commission for the sale of insurance to the BPG Properties, Ltd. account. BPG Properties manages the Berwind Group's real estate properties. (NT. 10/21/09, p. 122) As a "Berwind Group entity," DiDomenico claimed ECBM was obligated to pay her a commission for the account under the house broker agreement. (NT, 10/21/09, p. 119-22) ECBM refused to pay her any commission for the BPG Properties account, claiming that the account was produced by another

employee at ECBM and, in any case, was not part of the Berwind Group of accounts referenced in the house broker agreement. (NT, 10/19/09, p. 202)

On February 17, 2006, ECBM terminated DiDomenico, without prior notice or warning, for allegedly failing to fulfill her responsibilities under the house broker agreement. (NT, 10/22/09, pp. 24-25) Consequently, ECBM discontinued the payment of deferred commissions and additional deferred commissions under the termination agreement because she was allegedly terminated for cause. (NT, 10/22/09, p. 26) DiDomenico alleged that ECBM wrongly terminated the agreements in retaliation for her claims for commissions owed for the Schmidt's Bakery and BPG Properties accounts. (NT, 10/22/09, pp. 26-27)

ECBM filed this action on March 1, 2006, seeking a declaratory judgment for a determination that it was not obligated to pay any sums under the termination or house broker agreements. ECBM also alleged a cause of action for breach of contract.

Sheila DiDomenico filed a counterclaim which alleged a cause of action for breach of contract against ECBM under the termination agreement for discontinuing the payment of deferred commissions and additional deferred commissions. DiDomenico also alleged a cause of action for breach of contract under the house broker agreement for ECBM's failure to pay her a commission for the BPG properties account as well as several other accounts.

After a five-day bench trial, this court found in favor of

DiDomenico on her counterclaim and dismissed ECBM's claims. Subsequent hearings were held limited to the issue of damages. At the conclusion of these hearings, this court issued an order dated August 31, 2010, finding that counterclaimant DiDomenico was entitled to damages for the following:

1. All outstanding amounts owed under the termination agreement for deferred commissions and additional deferred commissions in the principal amount of $405,041.51.

2. One-half the commission earned for the BPG Properties, Ltd. account in the principal amount of $ 111,772.00.

3. Other principal amounts totaling $16,593.62.

4. Pre-judgment interest on all principal amounts due at the statutory rate of six percent per annum totaling $106,513.50.

5. Post-judgment interest at the statutory rate of six percent per annum on the total award of $639,920.63.

This court also denied DiDomenico's motion for counsel fees. The parties subsequently filed timely post-trial motions which this court denied by an order dated October 1, 2010.

ECBM now appeals this court's order of August 31, 2010. DiDomenico filed a cross-appeal challenging this court's determination that she was entitled to only one-half of the commission for the BPG Properties account

and this court's denial of her motion for counsel fees. No appeal has been filed to this court's October 1, 2010 order denying the parties' post-trial motions.

## II. DISCUSSION

### A. *ECBM's Appeal Should be Quashed.*

Initially, it should be noted that ECBM's appeal is procedurally improper. An appeal may only be taken from a final order of the trial court. See *Rae v. Pennsylvania Funeral Directors Ass'n*, 602 Pa. 65, 71, 977 A.2d 1121, 1124-25 (Pa. 2009); see also Pa. R.A.P. 341(a). "A final order is any order that: (1) disposes of all claims and of all parties; or (2) is expressly defined as a final order by statute; or (3) is entered as a final order pursuant [to statute]." Pa. R.A.P. 341(b). "A trial court's order at the conclusion of a trial...simply cannot become final for purposes of filing an appeal until the court decides any timely post-trial motions." *Chalkey v. Roush*, 569 Pa. 462, 469, 805 A.2d 491, 496 (Pa. 2002); see Pa.R.C.P. 227.1(a). Notices of appeal to interlocutory orders of a trial court are considered untimely and will foreclose appellate review of those issues prematurely raised. See *Pennsylvania Orthopaedic Soc. v. Independence Blue Cross*, 885 A.2d 542, 546 (Pa. Super. 2005).

In the present case, this court entered an order dated August 31, 2010 finding in favor of DiDomenico and against ECBM. Thereafter, the parties filed timely post-trial motions to this court's determinations. Before this court made a ruling on the parties' post-trial motions, ECBM filed its notice of appeal to this court's order of

August 31, 2010. However, ECBM subsequently failed to appeal this court's order of October 1, 2010 denying its post-trial motions. Accordingly, ECBM's appeal should be quashed because it did not appeal the final order of this court.

B. *The Trial Court's Determinations are Clearly Supported by the Record.*

The evidence of record provides clear support for this court's award of damages on the counterclaims pursuant to the termination and house broker agreements. The trial court, sitting as the trier of fact in a bench trial, is the sole judge of credibility and conflicts in the evidence. See *Miller v. Brass Rail Tavern Inc.*, 702 A.2d 1072, 1076 (Pa. Super. 1997). See also *Mackay v. Mackay*, 984 A.2d 529, 533 (Pa. Super. 2009) ("The weight afforded to the testimony of the witnesses as well as credibility determinations are within the exclusive province of the trial court."). Therefore, "[t]he findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury." *Amerikohl Mining Co. v. Peoples Natural Gas Co.*, 860 A.2d 547, 549-50 (Pa. Super. 2004). Thus, in an appeal from a decision after a bench trial, the appellate courts consider the evidence in the light most favorable to the verdict winner. *Employers Mut. Cas. Co. v. Boiler Erection and Repair Co.*, 964 A.2d 381, 387 (Pa. Super. 2008).

The decision of the trial court in a non-jury trial will be reversed only where the trial court has abused its discretion or if its findings are premised on an error of law. *Amerikohl*

*Mining,* 860 A.2d at 549-50. The trial court does not abuse its discretion where there is a mere difference of opinion regarding an interpretation of the facts. See *Viener v. Jacobs,* 834 A.2d 546, 556 (Pa. Super. 2003). Rather, an abuse of discretion is found only in flagrant cases where there is no reasonable ground for a difference of opinion. See *Miller v. Krug,* 386 A.2d 124, 127 (Pa. Super. 1978). Thus, the trial court's findings are controlling and will not be reversed unless those findings are not based upon competent evidence. *Viener,* 834 A.2d at 554.

ECBM does not allege any error on the part of this court but simply disagrees with this court's conclusion based on the evidence presented. The testimony and exhibits presented in this case provide sufficient evidence to support this court's determination. Accordingly, this court's awards pursuant to the termination agreement and house broker agreement were proper and should be affirmed.

C. *This Court Properly Awarded Shelia DiDomenico Deferred Commissions and Additional Deferred Commissions Owed Pursuant to the Termination Agreement.*

ECBM argues that DiDomenico breached the house broker and termination agreements, thereby justifying her termination for cause and the simultaneous cancellation of her deferred commissions and additional deferred commissions.

However, the house broker and termination agreements do not provide a basis for ECBM to suspend the payment

of deferred commissions and additional deferred commissions.

As a house broker, DiDomenico was simply compensated for any new account she was able to procure for ECBM. Pursuant to the house broker agreement, DiDomenico was not formally obligated to perform any task or tasks for ECBM. The house broker agreement specifically provides that she was no longer an employee of ECBM and thus "had no obligation to work any particular hours or any particular amount of hours." Exhibit D-5, house broker agreement, ¶ 10. The agreement further provides that DiDomenico merely had to act with "a view toward locating prospects and helping ECBM retain and expand its client base." Exhibit D-4, termination agreement, ¶ 8. Indeed, the evidence at trial established that DiDomenico provided transitional assistance to her successor and repeatedly offered consultation which ECBM never accepted. (NT, 10/21/09, pp. 159-61, 164-71)

Furthermore, each party could terminate the house broker agreement with thirty (30) days prior written notice to the other. Exhibit D-5, house broker agreement, ¶ 5. Accordingly, under the facts of this case, the house broker agreement could not serve as a basis to nullify the termination agreement.

The termination agreement permitted ECBM to discontinue the payment of deferred and additional deferred commissions, but only if DiDomenico violated one of the restrictive non-compete covenants related to

soliciting clients, providing information or recruiting employees of ECBM for a competitor. Exhibit D-3, employment agreement, ¶ 5. At trial, no evidence was presented that established these non-compete covenants were violated.

The testimony and exhibits presented in this case clearly provide sufficient evidence to support this court's decision to award counterclaimant DiDomenico her outstanding deferred commissions and additional deferred commissions. DiDomenico was terminated without cause and ECBM improperly withheld the payment of her outstanding commissions. Accordingly, this court properly dismissed ECBM's complaint in its entirety and found in favor of counterclaimant DiDomenico on her claim for breach of the termination agreement.

D. *This Court Properly Awarded Sheila DiDomenico One-Half of the Commission Paid for the BPG Properties Account Under the House Broker Agreement.*

The house broker agreement states that DiDomenico was entitled to commissions earned for "new insurance sold to the Berwind Group." (NT, 10/22/09, pp. 16-17) DiDomenico contends that she was entitled to the full commission of $223,544.00 for the BPG Properties account because it was a "Berwind Group entity" under the house broker agreement. ECBM claims that she was not entitled to any commission for the BPG Properties account because she did not produce the account and, regardless, BPG Properties was not part of the "Berwind Group" under the house broker agreement. At trial, both

parties presented significant evidence of record in support of their respective positions.

In support of her position, DiDomenico established that she made the initial contact with the Berwind Group on behalf of ECBM. (NT, 10/21/09, p. 119) It was further established that she continued to service the account until her retirement in 2004. (NT, 10/19/09, pp. 189-90)

On the other hand, the house broker agreement fails to define what accounts are encompassed under the "Berwind Group." The Berwind Group is a diversified, multi-national conglomerate which owns businesses in a variety of industries. (NT, 10/21/09, p. 122) BPG Properties, Ltd., was created in 2005 as a separate and independent entity from the Berwind Group to serve as Berwind's real estate management firm. (NT, 10/19/09, pp. 194,201)

Furthermore, BPG Properties had no contact with Sheila DiDomenico; rather, they dealt exclusively with another ECBM employee, Gloria Forbes. (NT, 10/19/09, p. 201) ECBM subsequently paid a commission to Gloria Forbes for producing the BPG Properties account. (NT, 10/19/09, p. 202)

This court thoroughly examined the record, evaluated the evidence and weighed the competing testimony. Based on the totality of the circumstances, this court properly decided DiDomenico was entitled to one-half of the commission paid, totaling $111,772.00, for ECBM's sale of insurance to the BPG Properties account. This court, sitting as the trier of fact in a non-jury

trial, was free to conclude that DiDomenico was entitled to all, some or none of the commission based upon the competent evidence presented. See *Miller v. Brass Rail Tavern Inc.*, 702 A.2d 1072, 1076 (Pa. Super. 1997). Accordingly, this court's decision to award one-half the commission for the BPG Properties account was proper and should be affirmed.

E. *This Court Properly Used the Legal Rate of Six Percent to Calculate Pre-judgment Interest.*

This court properly awarded pre-judgment interest at the statutory rate of six percent on her damages for commissions owed under the termination agreement. Under the law of this commonwealth, pre-judgment interest is a matter of right in breach of contract cases. See *Fernandez v. Levin*, 519 Pa. 375, 378, 548 A.2d 1191, 1193 (Pa. 1988); see also *Osial v. Cook*, 803 A.2d 209, 215 (Pa. Super. 2002) (a plaintiff is also entitled to post-judgment interest on an award for a specific sum of money from the date of the verdict). The right to pre-judgment interest begins at the time payment is withheld after it has been the duty of the debtor to make such payment. *Id.* The statutory rate of interest used to calculate pre-judgment interest is fixed at six percent per annum. 41 P.S. § 202. In anticipation of non-payment of money due, parties to a contract may modify the legal rate of interest by clearly expressing the intention to apply a different rate. See, e.g., *Pittsburgh Const. Co. v. Griffith*, 834 A.2d 572, 593 (Pa. Super. 2003) (a contract's explicit language — "shall bear interest at the rate of 18% per annum from the date such final was due until paid" — indicates the parties intended

this increased rate to apply to pre-judgment interest calculations). Absent an express contractual agreement to the contrary, the interest rate fixed by law attaches to the wrongful detention of a principal sum. *Dasel Min. Corp. v. Industrial Fuels Corp.,* 473 A.2d 584, 595 (Pa. Super. 1984).

The contractual provision at issue in this case, paragraph four of the termination agreement, clearly was not intended to establish the rate of pre-judgment interest. Paragraph four of the termination agreement provides the following:

All payments of deferred commissions will include interest at the applicable Federal rate described in Section 1274 of the internal revenue code of 1986 or any successor provision of similar import ("applicable federal rate") determined for each calendar year in the December preceding such calendar year. Thus, the applicable interest rate for each month in 2004 shall be the said Federal rate established in December, 2003.

In connection with premium billings for policies forming part of the book of business which were in effect at December 31, 2003 and which are now being paid in future installments, ECBM will pay [DiDomenico] additional deferred commissions [over a period of sixty-months in monthly installments], which monthly payments already include interest at the rate of five 5% per annum.

Exhibit D-4, termination agreement, ¶ 4.

Nothing in this language covers this situation in which ECBM wrongfully refused to pay the commissions which were due and owing to DiDomenico under the termination agreement. Instead, this language explicitly provides for the inclusion of interest at the time commissions are paid under the contract. In contracts which bear an interest rate higher or lower than the legal rate, the parties must state that this contractual rate will be the rate applied after the debt matures. *Smith v. Mitchell,* 616 A.2d 17, 21 (Pa. Super. 1992); *Daset Mining Corp.*, 473 A.2d at 595. In this instance, the termination agreement fails to contain any language expressing the intent to apply the applicable federal rate of five percent to the untimely payments of commissions. Accordingly, this court properly awarded pre and post-judgment interest at the statutory rate.

F. *This Court Properly Denied Sheila DiDomenico's Motion for Counsel Fees.*

Counsel fees may be available to a prevailing party if they can demonstrate the opposing party's conduct in commencing an action was arbitrary, vexatious, or in bad faith. 42 Pa.C.S. §2503(9). The grant or denial of counsel fees lies within the sound discretion of the trial judge. See *Maurice A. Nernberg & Associates v. Coyne*, 920 A.2d 967, 971 (Pa. Commw. 2007). Absent an abuse of discretion, the decision of a trial judge to deny counsel fees will not be reversed by an appellate court. *Shearer v. Moore*, 419 A.2d 665, 669 (Pa. Super. 1980).

In the present case, DiDomenico has failed to demonstrate ECBM's conduct in commencing this action

was arbitrary, vexatious, or in bad faith. Although this court did not agree with ECBM's legal position, there was no basis for the award of counsel fees.

Accordingly, this court clearly did not abuse its discretion in denying the motion for counsel fees.

## III. CONCLUSION

Based upon the foregoing analysis, this court's determinations were proper and should be affirmed.