## Tucker *v.* Binenstock, Appellant.

Argued November 30, 1932. Before FRAZER, C. J., SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*Marshall A. Coyne,* with him *David J. Smith* and *Moss & Moss,* for appellant.—A bill in equity will not lie for an accounting of an illegal business: Rosenthal v. Ostrow, 287 Pa. 87; Vandegrift v. Vandegrift, 226 Pa. 254; Ad-Lee Co. v. Meyer, 294 Pa. 498; Conemaugh Brewing Co. v. Bennett, 60 Pa. Superior Ct. 543.

It is not necessary that the illegality be pleaded: New York & Pa. Co. v. Coal Co., 286 Pa. 72.

*Grover C. Ladner,* of *Ladner & Ladner,* for appellee.— Where the aid of the alleged illegal transaction to make out the case is not necessary, a suit may be successfully sustained: New York & Pa. Co. v. Coal Co., 286 Pa. 72; Frazier v. Mansfield, 305 Pa. 359.

OPINION BY MR. JUSTICE KEPHART, January 3, 1933:

Tucker and Binenstock, the parties to this suit, with four others, organized in 1923 the New Century Realty Company. The purpose of the corporation, as outlined in its charter, was dealing in real estate, but its real purpose was the purchase of a brewery, and it did purchase the property operated by the Class & Nachod Company, a brewing concern. To further their plain, the Atlantic Brewing Company, another corporation, was formed. It leased this property from the New Century Company. The Atlantic Company was to operate the brewery in manufacturing near beer. The stock in the New Century Company was held by the parties hereto and their associates, but within a year the four associates sold their respective interests to the two parties to this ac-

tion. The original organizers did not hold the stock of the brewing company; it was issued to Maurice A. Tucker, son of the appellee, Daniel J. Kopp, Jr., and James Kammerer. It was contended at the hearing that this stock was held in trust for the owners of the realty company, but in other litigation it was testified that the stock was owned individually. Tucker, Kopp and Kammerer were the managing officers of the brewing company.

Appellee stated that the brewing company began operations shortly after purchase and continued until November, 1926, when it was sold to Feuerstein. See Feuerstein v. New Century Realty Co., 304 Pa. 271. The testimony in this and the Feuerstein Case (admitted in evidence in this case) shows that the Atlantic Company conducted an illegal liquor business, selling beer to the public with an alcoholic content as high as 4% in violation of federal and state laws. This definitely appears from the padlock proceedings before Judge McDevitt instituted by the Commonwealth in December, 1926. The testimony of police officers in that proceeding showed there were large quantities of beer of illegal alcoholic content, as high as 4%, in the brewery on July 24, 1926, and that although the brewery had been libelled by the federal government and was at that time under the control of federal officers who had closed it and placed government seals on its doors, yet a second visit in November, 1926, showed the government seals broken and the beer gone, trucks and railroad cars having been used to remove it, and thousands of gallons of new beer were being brewed in other parts of the establishment. During this period these parties owned the brewery and their agents managed it. This, taken in connection with appellee's evidence in this case that beer was sold up to November, 1926, resulting in gross receipts of $1,876,-707.50, makes it clear that such sales were illegal. Further, it appeared that the sum of $188,000 was paid to police officers for "protection." Evidence as to book-

keeping methods employed by the company substantiates a finding of illegality. Shortly after the brewing company began operations its customers' names were removed from the books and numbers substituted.

Appellee, Tucker, said that "beer" was sold, and his evidence shows an intimate knowledge of the brewery business, acquired from 30 years' experience. He stated he had received $89,737.42 from the brewing company, which was a division of profits from the sale of the beverage from the Atlantic Brewing Company; that the beer was distributed in bulk and sold by barrels and half barrels in New York, Baltimore and Pittsburgh. The purchasers were bottlers, wholesalers, saloon-keepers, and night clubs, who, he supposed, "would sell it out of the keg." He also testified that "one-half of 1% is not enough alcohol to give the beer the tone. You have to have something in the beer to warm up the stomach to digest the malt and hops."

In 1924 the federal authorities filed a bill of complaint against the brewing company. In its answer to the bill, the company admitted that it "did not have any permit to manufacture beer in 1924, and that an application by the said company for a permit was refused." There is no evidence in this case to show that a permit was ever subsequently acquired. See Com. v. Fisher, 96 Pa. Superior Ct. 155, 158; Premier C. & B. Co. v. Pa. Alcohol P. B., 292 Pa. 127.

Typical of the parties' conduct of their business was the fake transaction by which Binenstock and Tucker eliminated their four associates, when Binenstock pretended to transfer his holdings in the realty company to Tucker to induce Lipschutz, one of the associates, to part with his stock. Appellee admitted the dishonesty of this transaction by his reply to the interrogation of the court that "he was cheating Lipschutz," and the further question, "You went into the conspiracy to lead Lipschutz to believe you were paying the money? A. Well, yes, if you take it that way."

Tucker instituted this bill for an accounting by appellant of the receipts and disbursements of the Atlantic Brewing Company from August, 1923, to November, 1926. After hearing, the court below found among other things: "The chancellor was not favorably impressed with the testimony upon the character of the business carried on by the parties to this proceeding; ......the testimony of Miss Martin would indicate that several transactions with unknown persons were at least suspicious. These individuals were not known by name, but by numbers." The court also referred to the special account, reciting the payment for "protection" to police officers, but because the parties sustained the relation of partners, and since appellant, Binenstock, took possession of or received all the moneys of these corporations and made the disbursements, the chancellor found there should be an accounting of the receipts and disbursements of the Atlantic Brewing Company, and also of a specific item of $173,530, rent paid to the New Century Realty Company.

We need not consider all the questions raised in this appeal. We will, therefore, pass over those relating to the findings of the chancellor, not supported by the evidence, that equity had no jurisdiction to decree an accounting of the funds of a corporation in which neither parties to the bill were stockholders, officers or employees, but sustained a relation to that corporation only through a holding company in which both were stockholders. Passmore v. Allentown & R. T. Co., 267 Pa. 356, holds that in any event an accounting should not be decreed where the books of the company have been in the possession of plaintiff in the bill for at least three years prior to the litigation; and further, that a decree for an accounting should not be ordered as between partners where the pleadings do not aver the partnership, the evidence does not sustain it, and where the pleadings and testimony show that the business to be accounted was conducted under corporate management, and the moneys

were received through that management, and all the affairs were duly administered as corporate matters. Interesting as all these questions are, we pass to the more important ones affecting public policy.

There is no principle more clearly established than that the law will not enforce an illegal transaction, nor will it be an instrument for distribution of moneys illegally gained: Ad-Lee Co. v. Meyer, 294 Pa. 498, 502. It simply leaves the wrongdoers where it finds them. The rule is not designed for the protection of the more dishonest of the partners, although the latter may benefit from its application, but rests upon a broad principle of public policy; the government seeks to punish transgressions of the law, not to reward or aid them by countenancing any phase of the illegality. Therefore, in litigation where the government is not a party, where transactions are tainted with wrongdoing, as violations of statutes intended for the upbuilding of the moral structure of the body politic, no court will lend its aid where the cause of action is grounded on such immoral or illegal acts: Rosenthal v. Ostrow, 287 Pa. 87; Vandegrift v. Vandegrift, 226 Pa. 254; Conemaugh Brewing Co. v. Bennett, 60 Pa. Superior Ct. 543, 545.

Here equity is asked to use its power to distribute the proceeds of a business which was in open defiance of the law, illegally selling liquor without a permit, a product in thousands of gallons that had been libelled by the government, making gross sales of approximately two million dollars; paying $188,000 for police protection; registering their clients on the books by numbers instead of names, and whose properties were finally padlocked by the courts. It is extraordinary, to say the least, to ask a court of justice to encourage and protect such flagrant violators of the law. We make no distinction between the parties. It is unnecessary to discuss the penalty that must follow acts of this kind when an appeal is made to the courts.

260

It is urged that there are no assignments of error which present the question of illegality, nor does the statement of the question involved raise it. We need not dwell on this. Two of the assignments are amply sufficient to cover the question, and even if it had been omitted from the assignments or question involved, if found to exist, this court of its own motion will so declare it.

Appellee hopes to escape the consequences of these acts and of the rules set forth in the above cases because the court did not find as a fact that the business was illegal, nor was it requested to so find, and the answer of appellant did not raise any such issue. The court below, in substance, found the fact of illegality; but if the court below had not so found that would not prevent this court from appraising the evidence at its true value. However, the court below found as quoted above; all that it failed to do was to apply the law. It is not necessary that the defense of illegality appear in the pleadings of record: New York & Penna. Co. v. Cunard Coal Co., 286 Pa. 72, 81; 3 Williston on Contracts, 2867.

Appellee further contends that it does not have to show any illegal transaction to establish its case, and therefore such illegality is no bar to relief. A quotation from New York & Penna. Co. v. Cunard Coal Co., supra, is relied upon for this position. The statement of law referred to in that case is undoubtedly correct, and if the illegality did not appear upon this record as we have shown above, it might apply to this case. The facts and actual decision in the case referred to are pertinent. A purchaser of coal agreed to pay seller a bonus in excess of the maximum price fixed by the federal statute. Due to alleged improper weights the buyer sought to recover this amount, relying on the same proposition of law appellee urges here. The court reversed judgment for the plaintiff below because it appeared from the record that the entire transaction was designed to circumvent federal legislation. So it may be answered here that this

record shows a plan to evade the state and national prohibition law.

It was urged that at the argument of Feuerstein v. New Century Realty Co., supra, we held the transaction not illegal. We did as it related to the facts of that case. What we there stated, following the court below, was that Feuerstein on November 2d when he bought this property from the New Century Company had no knowledge of its illegal transactions. We stated: "There is no evidence to substantiate the claim of defendants that plaintiff knowingly entered into the contract with intent to violate the prohibition law. The attacks upon his character do not support such a conclusion." We made no finding with respect to the character of the business prior to November 2d, though the record disclosed its character.

Appellee avers he was not active in the conduct of the brewing business, and that things were done without his consent or knowledge. Not only does the testimony speak strongly against this contention, but the chancellor in his decree sealed the matter when he found they were partners doing a partnership business, and that one partner was being asked to divide the profits arising from illegal sales amounting to $1,876,707.50; nor does it appear that any other business was involved. There can be only one conclusion, the record shows that Tucker knew everything that was going on. He knew who sold the product; the books were kept under the personal direction of their secretary; while he says he never visited the brewery very often, he went to the office, looked over the monthly statements, and knew about the general business of the company each year, the work necessary to be done on the machinery, the expense in repairs, when it began to do business, and finally he admits receiving at least $89,000 directly from the brewing business in which he was not a stockholder. Tucker had just as much knowledge of the business as Binenstock.

His explanations cannot destroy the reality of his direct knowledge of the situation.

The court below found that Tucker was entitled to an accounting for $173,530 rent paid to the New Century Company. The pleadings did not embrace a prayer for an accounting of the New Century Company, and a finding or conclusion such as this just quoted was out of place. The court erred in so holding, but there is another objection more formidable.

We find that the business as conducted by these partners was illegal, and the profits received therefrom were moneys received from illegal transactions. The entire transaction from its inception in August, 1923, to the end in 1926, when the business was sold to Feuerstein, was a scheme to frustrate state and federal prohibition laws. Will the fiction of corporate entity protect the parties involved and place on the moneys received as rent ($60,000 a year) the seal of legality in the hands of the New Century Company, the landlord? We need only discuss the question from this standpoint in equity. May a landlord who engages in an illegal transaction be compelled in equity to account for and divide money with his coöwners, which is received as rent from the premises where the illegal business is carried on, his coöwners being also engaged in the same illegal business or transaction? It will be noted that in the corporate landlord, and the operating corporation, we have an absolute identity of parties in interest. The young men who managed the brewery and in whose name the stock was placed, were merely the nominees of the owners of the stock of the realty company. If we strip the transaction of its two corporate forms, we have the parties to this equitable proceeding owning the ground where the brewery stands, and conducting the brewery business. Will the shield of corporate entity now protect them?

We need not discuss the penal aspect of the matter, but as the case rests on the identity of parties, and as we conclude that the entire transaction was a scheme to

frustrate or defraud state and federal prohibition laws, we may also conclude that the rent received was merely another name for profits from the illegal transaction. It is to situations such as this that our decisions most aptly apply.

The fiction of a corporation as an entity distinct from the aggregate of individuals comprising it was designed to serve convenience and justice. There is consequently an exception recognized wherever the rule is known, namely, that the fiction will be disregarded and the individuals and corporation considered as identical whenever justice or public policy demand it and when the rights of innocent parties are not prejudiced thereby nor the theory of corporate entity made useless. Thus we have held that where one corporation conducts its own business through the instrumentality of another, and the management, directors, and parties in interest of the two corporations are identical, the capital invested therein by the former cannot be treated as a loan to the latter against the rights of third parties: S. G. V. Co. v. S. G. V. Co., 264 Pa. 265. The court there said, at page 269: " 'For purposes of equity the courts will look behind that artificial personality [the subsidiary corporation] and if need be ignore it.' " In Chicago, M. & St. P. Ry. v. Minn. Civic Assn., 247 U. S. 490, two railroad companies formed a third company to hold certain terminal tracks in order to make separate switching charges over those tracks. The Supreme Court affirmed an order discontinuing the separate charges, saying at page 501: "In such a case the courts will not permit themselves to be blinded or deceived by mere forms of law but, regardless of fictions, will deal with the substance of the transactions as if the corporate agency did not exist and as the justice of the case may require." The facts in U. S. v. Milwaukee Refrigerator Transit Co., 142 Fed. 247, are analogous to those in the case at bar. There a brewing company organized a transit company which handled its shipping. Carriers paid the transit company, in com-

missions for the orders, amounts corresponding to that received by the brewing company as rebates prior to the Elkins Act. The court upheld a decree enjoining such payments. The corporate entity was not permitted to disguise the fact that the money so received was in effect paid to the brewing company, and, as such, constituted rebates. So here the fact that the illegal profits were received by the realty company in the form of rent will not be permitted to disguise the fact that both corporations were owned by the same individuals, who cannot, by reliance upon the fiction of corporate entity, convert illegal gains into legal rents.

Appellee's contention would set up a doctrine whereby laws may be easily set aside, and, while hired servants run close to the windward of criminal laws, the real owners may enjoy all the benefits of ill-gotten gains, and laugh defiance at the laws they violate. Courts cannot lend their aid to such schemes. They will tear away the screen of corporate protection and strike down the illegal acts, and though the criminal laws may not reach the real owners, certainly equity will not divide the illegal profits. While it is true in many of our cases we have held that we cannot set aside the corporate entity merely to accomplish or set up what would simply be an individual transaction, or the business of another company (Flinn's Est., 310 Pa. 206; Callery's App., 272 Pa. 255), here we have a fraud perpetrated on the government, which, as we have said above, equity at least will not encourage.

Decree reversed and bill dismissed without cost to either party.