**Evelyn AUTREY, Individually and as Representative of the Estate of J.D. Autrey, and Dan Autrey, Plaintiffs,**

v.

**22 TEXAS SERVICES INC. (Formerly Known as 22 Texas Partners, Inc.); 22 Texas Partners Management, Inc.; Complete Care Services, L.P.; Arizona Partners, Inc.; John H. Durham; Peter J. Licari; Michael D. D'Arcangelo; John P. Durham; Wallace Cannon; Bob Sorenson; Christine Bogrette; and Carol Durham, Defendants.**

No. Civ.A.G–99–186.

United States District Court,
S.D. Texas,
Galveston Division.

Jan. 6, 2000.

Kenneth Ross Citti, Citti & Crinion, Houston, TX, for Ross Citti, mediator.

Michael David Sydow, Verner Liipfert, Houston, TX, for Evelyn Autrey, J.D. Autrey, Dan Autrey, plaintiffs.

William S Bush, Bush & O'Brien, Houston, TX, for 22 Texas Services Incorporated, Arizona Partners, Inc., defendants.

William S. Bush, Bush & O'Brien, Houston, TX, Richard H. Caldwell, III, Mayor, Day, Caldwell & Keeton, Houston, TX, for John H. Durham, defendant.

William S. Bush, Bush & O'Brien, Houston, TX, Marion E. McDaniel, Jr., Liddell, Sapp, Zivley, Hill & LaBoon, Houston, TX, for Peter NMI Licari, Michael D. D'Arcangelo, defendants.

Martin Joseph Thompson, Jr., Office of the Attorney General, Austin, TX, for Texas Atty. General, movant.

## ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, FOR SEPARATE TRIALS AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

KENT, District Judge.

Plaintiffs bring this action against Defendants seeking compensatory and punitive damages for the alleged wrongful death of J.D. Autrey. Mr. Autrey, a resident of one of Defendants' nursing homes until shortly before his death, allegedly died as a result of the negligence of the nursing home staff and administration. Now before the Court is a Motion for Summary Judgment filed by Defendants John B. Durham, John P. Durham, Christine Bogrette, and Carol Durham on November 24, 1999, as well as a Motion for Summary Judgment filed by Plaintiffs on December 15, 1999. For the reasons stated below, both Motions for Summary Judgment are **DENIED**.

## I. FACTUAL SUMMARY

### A. *The Underlying Incident*

At the time of his death, J.D. Autrey was a resident at the Caldwell Health & Rehabilitation Center ("Caldwell"). While living there, Plaintiffs report that Mr. Autrey began to suffer from methicillin-resistant staphylococcus aureus ("MSRA"), a bacteria resistant to most antibiotics. Plaintiffs claim that on three different occasions Mr. Autrey had drainage oozing from his eyeballs—a clear indication that an infection had set in. According to Plaintiffs, Mr. Autrey acquired these MSRA infections because Caldwell staff members failed to wash their hands between contacts with different residents. The infection became so severe that by May 3, 1998, Mr. Autrey had a fever, an elevated white blood cell count, and drainage out of his left eye. One week later, on May 10, 1998, Mr. Autrey's wife arrived at Caldwell only to find Mr. Autrey's shivering, naked body huddled in a corner of his bedroom. Apparently, the air conditioner had malfunctioned, thereby plummeting the temperature in the room. The next day, a member of the Caldwell staff found Mr. Autrey slumped in a wheelchair with a fever, and had him admitted to the hospital. Doctors diagnosed Mr. Autrey with pneumonia, and sputum cultures taken at the hospital revealed that the infecting agent was MSRA. Despite attempts to aggressively stave off the bacteria, Mr. Autrey died of MRSA pneumonia on June 13, 1998. Plaintiffs allege that the Caldwell staff failed to assess and monitor the con-

dition of Mr. Autrey's health and that this negligence ultimately resulted in his death.

Evidence also indicates that the facts surrounding Mr. Autrey's death may have been indicative of a broader problem at Caldwell. In October 1997, investigators with the Texas Department of Human Services inspected Caldwell and found numerous health violations. Some of the problems identified by TDHS investigators included a shortage of qualified staff, instances of residents being left to lie in feces and urine for long periods of time, instances of residents not receiving baths or oral care, and a lack of adequate precautions to prevent the spread of antibiotic-resistant infections. TDHS investigators completed their survey in October and provided copies to Caldwell administrators, who then forwarded the copies to management at the area and corporate levels.

B. *Defendants' Connections with Caldwell*

Caldwell is one of forty-nine nursing homes and assisted living facilities in Texas owned by Defendant 22 Texas Services, L.P. In June 1997, Defendant John H. Durham had asked Defendant Complete Care Services, L.P. ("CCS") to perform operational due diligence for all of those facilities in anticipation of possible purchase from then-owner Beverly Enterprises. CCS eventually purchased the forty-nine nursing homes for approximately $152 million and then assigned its complete ownership interest in the homes to 22 Texas Services, L.P. In return for the transfer of interest, 22 Texas Services, L.P. provided CCS a "development fee" and an exclusive twenty-year management contract to manage the homes. Under that contract, CCS employs key management personnel at each home, while 22 Texas Services, L.P. employs the other staff members.

Defendant CCS, Caldwell's management company, is a limited partnership formed under the laws of Pennsylvania. CCS has one general partner, Arizona Partners, Inc. ("Arizona Partners"), a Pennsylvania corporation. CCS's limited partners are Defendants John H. Durham, John P. Durham, Christine Bogrette, Peter Licari, Michael D'Arcangelo, and Venture 22 Corporation ("Venture 22"), of which John H. Durham is the sole shareholder. According to the limited partnership agreement, Arizona Partners has a one percent interest in CCS and is responsible for the partnership business and the liabilities arising out of the partnership business.[1] John P. Durham and Bogrette are the sole shareholders of Arizona Partners; John H. Durham is the president; Licari, D'Arcangelo, John P. Durham, and Robert Sorenson are vice presidents; Carol Durham is secretary; and John P. Durham, D'Arcangelo, and Sorenson are assistant secretaries. Tax records indicate that Arizona Partners, which lists its business address at 120 Gibralter Road, pays no rent or expenses for repairs or maintenance, nor does it spend any money on advertising. Arizona Partners had no cash assets in 1996 or 1997, and in 1997 it reported a net worth of $42,132.

Caldwell is owned by 22 Texas Services, L.P., a limited partnership formed under the laws of Texas.[2] 22 Texas Services, L.P. has one general partner, 22 Texas Services, Inc., a Pennsylvania corporation. The limited partners of 22 Texas Services, L.P. are John P. Durham, who owns a thirty percent interest, John H. Durham, with a twenty-one percent interest, and Licari and D'Arcangelo, who each own a nine percent interest. Under the limited partnership agreement, general partner 22 Texas Services, Inc. owns a one percent interest in 22 Texas Services, L.P. and is solely responsible for conducting the part-

---

1. The partnership business is the management of long-term health care facilities in several regions of the United States, including Texas, where Arizona Partners manages 115 facilities.

2. 22 Texas Services, L.P. was formerly known as 22 Texas Partners, L.P.

nership business and for liabilities arising out of the partnership business.[3] John H. Durham and Carol Durham are the sole shareholders of 22 Texas Services, Inc.; John H. Durham also serves as president and sole director; John P. Durham, Licari, and D'Arcangelo are vice presidents; and Carol Durham is secretary. Tax records indicate that 22 Texas Services, Inc., which like Arizona Partners lists its address as 120 Gibralter Road, pays no rent or expenses for repair or maintenance, has no employees or expenses for employees, and pays no costs for advertising. In 1997, 22 Texas Services, Inc. showed total assets of $54,955; in 1997, it showed a total loss of $80,399.

Each of the parties now seeks summary judgment regarding whether it is appropriate to pierce the corporate veil and hold Defendants John H. Durham, John P. Durham, Christine Bogrette, and Carol Durham individually liable for the injuries suffered by Mr. Autrey and his family.

## II. ANALYSIS

### A. *Summary Judgment Standard*

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When a motion for summary judgment is made, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Issues of material fact are "genuine" only if they require resolution by a trier of fact. *See id.* at 248, 106 S.Ct. at 2510. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Only disputes over facts that might affect the out-

come of the lawsuit under governing law will preclude the entry of summary judgment. *See id.* at 247–48, 106 S.Ct. at 2510. If the evidence is such that a reasonable fact-finder could find in favor of the nonmoving party, summary judgment should not be granted. *See id.; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Dixon v. State Farm Fire & Cas. Co.,* 799 F.Supp. 691, 693 (S.D.Tex.1992) (noting that summary judgment is inappropriate if the evidence could lead to different factual findings and conclusions). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

Procedurally, the party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. at 2553; *see also* FED. R.CIV.P. 56(c). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *See Matsushita,* 475 U.S. at 585–87, 106 S.Ct. at 1355–56; *Wise v. E.I. DuPont de Nemours & Co.,* 58 F.3d 193, 195 (5th Cir.1995). The Court must accept the evidence of the nonmoving party and draw all justifiable inferences in favor of that party. *See Matsushita,* 475 U.S. at 585–87, 106 S.Ct. at 1355–56. However, to meet its burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," but instead, must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 586–87, 106 S.Ct. at 1355–56 (quoting FED.R.CIV.P. 56(e)).

---

**3.** The partnership business of 22 Texas Services, L.P. is the ownership and operation of

more than 40 nursing homes in Texas.

B. *Is There a Genuine Factual Issue Regarding Whether the Corporate Veil Should Be Pierced?*

██ Defendants argue that Plaintiffs have failed to produce any evidence to justify piercing the corporate veil and thereby hold Defendants John H. Durham, John P. Durham, Christine Bogrette, and Carol Durham directly liable for Plaintiffs' injuries. This Court looks to the law of the state of incorporation for each corporate Defendant to determine whether its corporate entity should be disregarded. *See Amoco Chemical Co. v. Tex Tin Corp.*, 925 F.Supp. 1192, 1201 (S.D.Tex.1996) (*citing* Restatement (Second) of Conflict of Laws §§ 307, 309 (1971)). Defendants Arizona Partners, Inc. and 22 Texas Services, Inc. were both incorporated under the laws of Pennsylvania. Accordingly, the Court will apply Pennsylvania law in determining whether it should disregard the corporate entity and impute its acts to Defendants John H. Durham, John P. Durham, Christine Bogrette, and Carol Durham for liability purposes.

██ Under Pennsylvania law, there is a strong presumption against piercing the corporate veil. *See Lumax Industries, Inc. v. Aultman*, 543 Pa. 38, 669 A.2d 893, 894 (1995) (warning that courts should respect the corporate entity in the absence of exceptional circumstances to avoid rendering the corporate entity theory "useless" (*citing Wedner v. Unemployment Compensation Bd.*, 449 Pa. 460, 296 A.2d 792, 794 (1972))). Factors to be considered in disregarding the corporate form include—but are not limited to—undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs, and use of the corporate form to commit a fraud. *See id.* at 895 (*citing Department of Envtl. Resources v. Peggs Run Coal Co.*, 55 Pa. Cmwlth. 312, 423 A.2d 765 (1980)). Additionally, Pennsylvania law has long provided that the corporate veil may be pierced if justice and public policy would be served. *See Revere Press, Inc. v. Blumberg*, 431 Pa. 370, 246 A.2d 407, 411 (1968)

(noting that "it is proper to disregard the corporate entity when 'justice or public policy demand it' " (quoting *Tucker v. Binenstock*, 310 Pa. 254, 165 A. 247, 250 (1933))); *Ragan v. Tri–County Excavating, Inc.*, 62 F.3d 501, 508 (3d Cir.1995) (finding that under Pennsylvania law "no finding of fraud or illegality is required before the corporate veil may be pierced, but rather, the corporate entity may be disregarded whenever it is necessary to avoid injustice"). The primary concerns for courts deciding whether to pierce the corporate veil are determining whether equity requires that the shareholders' "traditional insulation" from personal liability be disregarded and discerning whether the corporate form is essentially a sham. *See Village at Camelback Property Owners Ass'n v. Carr*, 371 Pa.Super. 452, 538 A.2d 528, 532 (1988).

After wading through the briefs filed by the parties, which, stacked together stand eight-and-one-half inches high and weigh a whopping thirteen pounds, the Court turns to the individual merits of the parties' summary judgment arguments.

*1. Arizona Partners, Inc.*

██ Defendants first claim that Plaintiffs have failed to present any competent evidence that Arizona Partners, Inc. was undercapitalized. Defendants also claim that because Plaintiffs' expert, Dr. Kenneth McCoin, failed to consider the assets and capital of CCS, L.P. in calculating the capitalization of Arizona Partners, Inc., such testimony should be discounted. Defendants, however, are wrong on both counts. In this case, it is undisputed that Arizona Partners, Inc. had, at the time of the incident underlying this action, a net worth of approximately $42,000. *See Pls.' Resp. to Defs.' Mot. for Summ.J.Ex. 304A at 4.* In 1996 and 1997, the company operated with virtually no liquid assets. At the same time, the corporation assumed one hundred percent of the liability for the operation of not only forty-nine nursing homes in Texas but of numerous other facilities across the United States. At the outset, the Court notes that this financial

condition raises disturbing questions regarding whether Arizona Partners, Inc. was set up to be financially responsible to potential creditors. That said, the Court recognizes that these statistics cited by Plaintiffs fail to shed light on the status of Arizona Partners, Inc.'s capitalization at the time of incorporation. Nevertheless, the evidence relied upon by Plaintiffs somewhat supports the conclusion that Arizona Partners, Inc. may have been undercapitalized, particularly considering the potential liabilities to which it was subject. As noted previously, Pennsylvania courts have cited undercapitalization as a basis for piercing the corporate veil. *See, e.g., Camelback,* 538 A.2d at 535; *Peggs Run,* 423 A.2d at 768–69. Here, the fact that Arizona Partners, Inc. bore one hundred percent of the liability for the operation of numerous nursing homes with virtually nothing in the way of assets argues in favor of piercing the corporate veil—but because Plaintiffs do not discuss the financial condition of Arizona Partners, Inc. at the time of incorporation, the facts alleged by Plaintiffs do not conclusively resolve the issue.

The corporate structure of Arizona Partners, Inc. also suggests that the corporate veil should be pierced. At the time of incorporation, Arizona Partners had no employees, office space, or expenses; consequently, the company paid no rent and spent no money on advertising. *See Pls.' Resp. to Defs.' Mot. for Summ.J.Ex. 304B.* What is more, the Court finds it suspicious that Arizona Partners, Inc. apparently had nonfunctioning corporate officers. *See Depo. of Michael D'Arcangelo at 139* (commenting that he was unaware that he was in fact an officer of Arizona Partners, Inc.); *Depo. of Carol Durham at 9–10* (acknowledging that as secretary of both Arizona

Partners, Inc. and 22 Texas Services, Inc., she merely signed documents that John P. Durham and John H. Durham told her to prepare). Thus, if Plaintiffs can prove at trial that Defendants asserted control over the management and ownership of the Texas nursing homes owned by Arizona Partners, Inc., it would add credence to their claim that Arizona Partners, Inc. represents nothing more than a corporate sham benefitting Defendants, all of whom serve as the sole shareholders of Arizona Partners, Inc. But the Court reiterates that Plaintiffs have failed to conclusively prove up this issue so as to succeed on summary judgment. As a result, the Court will not deny a jury the opportunity to make such a determination. Accordingly, the Court finds a factual issue exists regarding whether the corporate entity of Arizona Partners, Inc. should be disregarded.

### 2. 22 Texas Services, Inc.

The other corporate entity involved, 22 Texas Services, Inc., owns forty-nine nursing homes and assisted living facilities in Texas. As the sole general partner in 22 Texas Services, L.P., it is entitled to only one percent of the partnership profits even though once the assets of the partnership are extinguished it assumes one hundred percent of the partnership's liability. *See Pls.' Resp. to Defs.' Mot. for Summ.J.Ex. 216*[4] The evidence indicates, however, that six months after formation the net worth of 22 Texas Services, Inc. was negative, as it had more than $54,000 in liabilities with no accompanying net assets. *See Pls.' Resp. to Defs.' Mot. for Summ.J.Ex. 304B.* Also noteworthy is the fact that the company was incorporated with an initial capitalization of only $25,000. *See id.*[5] Just like Arizona Partners, Inc., 22 Texas Ser-

---

**4.** The financial structure of 22 Texas Services, L.P., raises questions as well. The partnership allegedly came into existence in June 1997 with an initial capitalization of $1000. *See Pls.' Resp. to Defs.' Mot. for Summ.J. at 3.* By the end of 1997, 22 Texas Services, L.P. reported that the book value of its net worth was a negative $7.9 million, and even after accounting for accumulated depreciation and

amortization, the net worth remained a negative $6.2 million. *See id.*

**5.** 22 Texas Services, L.P. received an unsecured $120 million loan, which, according to Defendants, indicates that 22 Texas Services, Inc. was adequately capitalized because the only potential creditors of 22 Texas Services, Inc. were the potential creditors of 22 Texas

vices, Inc. pays no rent, has no employees or expenses. Unlike Arizona Partners, Inc., however, 22 Texas Services, Inc. has not paid a dividend to its shareholders. Based on the nature and risk of the nursing home business, the Court notes that engaging in the ownership of forty-nine nursing homes while also maintaining no net assets appears to amount to nothing less than a disputable issue regarding undercapitalization—but as noted previously it does not definitively resolve the issue. On that basis and for the reasons explained below, the Court will allow a jury to determine whether to disregard the corporate form of 22 Texas Services, Inc. Accordingly, the Court finds that a fact issue exists concerning whether actions taken by 22 Texas Services, Inc. should be imputed to its shareholders, Defendants John H. Durham, John P. Durham, Christine Bogrette, and Carol Durham for liability purposes.

### 4. Is Dr. McCoin's Analysis Proper?

Defendants offer several persuasive arguments questioning whether Plaintiffs' expert, Dr. Kenneth McCoin, has provided competent evidence that supports Plaintiffs' contention that Arizona Partners, Inc. and 22 Texas Services, Inc. were undercapitalized corporations. After carefully juxtaposing Defendants' assertions with the responses provided by Plaintiffs, the Court is not prepared at this time to announce that Dr. McCoin's analysis justifies a ruling in favor of Defendants that either Arizona Partners, Inc. or 22 Texas Services, Inc. were adequately capitalized. Given

this overview, the Court now turns to the intricacies of Defendants' individual arguments.

#### a. Depreciated Asset Value Versus Fair Market Asset Value

Defendants first take issue with Dr. McCoin's methodology in calculating the overall net worth of both Arizona Partners Inc. and 22 Texas Services, Inc., arguing that Dr. McCoin inappropriately based his analysis on depreciated asset values. Defendants claim that Dr. McCoin's analysis is appropriate only if he considers the fair market value of each company's assets. *See, e.g., Connors v. Peles,* 724 F.Supp. 1538, 1562 (W.D.Pa. 1989). To bolster this argument, Defendants focus on *Connors v. Peles,* 724 F.Supp. 1538, 1562 (W.D.Pa.1989), a case in which the district court found that a company's tax returns and financial statements, which used depreciated values, failed to adequately depict the value of the company's equipment. *Id.* at 1562. Defendants' insistence that *Connors* renders Dr. McCoin's opinion useless is wrong. *Connors* involved calculating the value of mining equipment. In that case, the reason to depart from book value was obvious—most of the assets of the corporation came from real estate, the value of which could not be expected to be reflected at all in the depreciated value used for the balance sheet. Here, Defendants have failed to show that the value of either Arizona Partners, Inc. or 22 Texas Services, Inc. derive predominately from real estate values (particularly since the entire value was

---

Services, L.P. Moreover, Defendants note that anticipated cash flows arising from the purchase of the nursing homes indicated that revenues would exceed debt service and operating expenses. Nevertheless, with a minimized capital contribution of $25,000, 22 Texas Services, Inc. remained the only partner responsible for the nursing home's liabilities—including tort and contract liabilities that could derive from either 22 Texas Services, L.P. or 22 Texas Services, Inc. Moreover, as Plaintiffs point out, at the time 22 Texas Services, L.P. purchased the nursing homes in Texas, it had incurred a total of $166,000,000 in debt, despite the fact that the

nursing homes were valued (at an optimistic level) of $157,700,000. On top of that, one of the creditors, German American Capital Corp., took a first lien on 100% of the value of the nursing home properties. Consequently, it remains to be seen whether 22 Texas Services, Inc. had any unencumbered equity and more importantly how much such a financial condition is relevant to the issue of capitalization. Even assuming ensuing cash flows created by the operation of the nursing homes, there remains a disputable issue regarding the overall "capitalization" picture of 22 Texas Services, Inc.

leveraged under liens to creditors). More importantly, Defendants have failed to demonstrated how using of a fair market value would affirmatively show that the two corporations were adequately capitalized. Therefore, while Dr. McCoin's analysis may have lacked calculations as to fair market value, such an omission is not fatal—at least for the time being, because even Defendants' assertions leave unanswered the question whether a capitalization calculation based on fair market value would have allowed Arizona Partners Inc. or 22 Texas Services, Inc. to meet all debt and liability obligations at the time of incorporation. Experts for both Plaintiffs and Defendants offer conflicting conclusions. While the Court finds that the best course of action at this time is for the parties to present their opposing methods of calculations at trial for the jury to consider, Plaintiffs are admonished to provide expert opinion regarding fair market value.

### b. Initial Capitalization

■ Second, Defendants argue that Dr. McCoin's affidavit fails to consider initial capitalization, and therefore his opinion should be discounted. The Court disagrees. First, Defendants' theory, if adopted, would mean that in determining adequate capitalization any economic analysis that looks to tax returns and year-end financial statements is inappropriate. The Court cannot reconcile this blanket proposition with the *Connors* case cited by Defendants. The *Connors* court held that because the corporation's insolvency was the "result of an unexpected deterioration of its sole source of income" an inference could not be drawn from the corporation's financial condition after the unexpected

event. *Connors,* 724 F.Supp. at 1570. Plaintiffs, however, are not making an inference that Defendants engaged in a sham merely because the Defendant corporations suffered bad financial times; rather, Plaintiffs assert that Arizona Partners Inc. began business with a capital stock of $1 with additional paid in capital of $5383, *see Pls.' Resp. to Defs.' Mot. for Summ.J.Ex. 304A,* while 22 Texas Services, Inc. incorporated with an initial capitalization of $25,000, *see Pls.' Resp. to Defs.' Mot. for Summ.J.Ex. 304B,* all the while allegedly leveraged to the hilt. Moreover, Defendants fail to articulate how the corporations' deteriorated financial situations were a result of "unexpected" events. While recognizing Defendants' argument that the assets and cash flow of the partnerships are relevant to whether the Defendant corporations could meet their debt obligations, the Court cannot dismiss the relevance of the capitalization calculations quoted by Plaintiffs. This, once again, demonstrates the existence of a fact question as to capitalization.

### c. Solvency

■ Defendants next assert that Dr. McCoin's analysis fails to consider all the relevant factors demonstrating the solvency of both Arizona Partners, Inc. and 22 Texas Services, Inc. Defendants point out that CCS, L.P., the entity charged with managing the nursing homes owned by Arizona Partners, Inc., remained solvent throughout the course of the litigation and met all creditor obligations as they became due. Therefore, according to Defendants, the working capital of CCS, L.P. and 22 Texas Services, L.P. were sufficient to cover debts arising from the operation of the nursing homes.[6] The Court rejects Defen-

---

6. In their Motion, Defendants rely on *Miller v. Brass Rail Tavern, Inc.,* 702 A.2d 1072 (1997), for the proposition that courts should evaluate whether a corporate entity is adequately capitalized based on the company's particular business purpose. *Id.* at 1076. *Miller* involved a tavern with an initial working capital of $10,000 in stock and a $24,500 loan from the tavern's sole stockholder. Noting that the capital needs of a tavern are low, the Pennsyl-

vania court found the business entity adequately capitalized for its particular business purpose. *Id.* at 1075. In one sense, Defendants appear to equate the capitalization needs of running a tavern to the capitalization requirements of operating a nursing home. Such a comparison will not do. In evaluating the particular business purpose of a nursing home, such an endeavor clearly requires a

dants' argument that even a nominal capitalization of $1.00 would be adequate to withstand Plaintiffs' attack on its corporate form. As noted above, Arizona Partners, Inc., as the general partner for CCS, L.P., and 22 Texas Services, Inc. as general partner for 22 Texas Services, L.P., were each completely liable for all the debts incurred by the nursing home facilities. To claim that the cash flow obtained by the two limited partnerships as a result of management services agreements is sufficient to show that the two corporations were adequately capitalized does not detract from the fact that Arizona Partners, Inc. undertook its obligations as general partner to CCS L.P. and the 49 nursing homes in Texas with only $42,000 in working capital, or that 22 Texas Services, Inc. incorporated with only $25,000. This evidence is insufficient to state that as a matter of law Arizona Partners, Inc. and 22 Texas Services, Inc. were adequately capitalized. Moreover, the cash flow projections of CCS, L.P. and 22 Texas Services, L.P. do not foreclose Dr. McCoin's opinion regarding the capitalization of Arizona Partners, Inc. Plaintiffs should note, however, that the working capital of Arizona Partners, Inc. remains a relevant factor for the jury to consider.[7]

### d. Insurance Coverage

■ Defendants then argue that Dr. McCoin's analysis remains incomplete because he failed to include the relevant insurance policies in his capitalization model. Specifically, Defendants point to the insurance carried by CCS, L.P. and 22 Texas Services, L.P. as evidence that Arizona Partners, Inc. and 22 Texas Services, Inc. were adequately capitalized. Citing Radaszewski v. Telecom Corp., 981 F.2d 305 (8th Cir.1992), Defendants argue that in this case the weak balance sheets carried by Arizona Partners, Inc. and 22 Texas Services, Inc. are irrelevant in terms of evaluating capitalization because both CCS L.P. and 22 Texas Services L.P. had at least $21,000,000 worth of combined liability insurance available to pay judgments such as the one Plaintiffs hope to obtain.

While acknowledging that insurance may be relevant to determining capitalization, the Court finds that Defendants' insurance-related arguments raise additional fact questions. To begin with, Radaszewski involved a different set of facts than the ones at issue in this case. There, the plaintiffs attempted to hold a parent company responsible for the undercapitalization of its subsidiary, but the Eighth Circuit looked to the subsidiary's insurance policy as proof that the subsidiary was not undercapitalized. Id. at 310. In the case at bar, Plaintiffs are not attacking the corporate form of either CCS, L.P. or 22 Texas Services L.P.; rather, Plaintiffs seek to hold the shareholders and managers of Arizona Partners, Inc. and 22 Texas

---

much larger financial commitment than that devoted to the operation of a tavern. To even suggest that this Court not pierce the corporate veil of Arizona Partners, Inc. or 22 Texas Services, Inc. because a state court in Pennsylvania found that a tavern with $34,500 in start-up capital was adequately capitalized is nothing short of ridiculous.

7. Referring to this Court's decision in Villar v. Crowley Maritime Corp., 780 F.Supp. 1467, 1477 (S.D.Tex.1992), Defendants also assert that Dr. McCoin's affidavit should be disregarded because it allegedly provides no evidentiary weight. Villar, however, is distinguishable. In that case, the Court rejected the expert's opinion as untrustworthy, noting that it contained "blatant misrepresentations" and amounted to nothing more than unsub-

stantiated conclusions. Id. at 1477 & n. 11. In the case at bar, Dr. McCoin offers a basis for his conclusion and points to particular facts that support his theory of undercapitalization for both Arizona Partners, Inc. and 22 Texas Services, Inc. In sum, the Court is not prepared to rule that Dr. McCoin has manufactured facts or has forwarded conclusory allegations. However, as noted previously, if at trial Dr. McCoin fails to consider initial capital contributions or to determine fair market value as part of his analysis then the Court will be inclined to revisit this issue upon proper motion by Defendants—especially since Defendants' experts, including Professor Robert W. Hamilton, Gary Beck, and Carmen Eggleston, have used these factors to reach a conclusion opposite from Dr. McCoin.

Services, Inc. liable for the anemic financial condition of both corporations.

With this distinction in mind, the Court turns to the actual insurance policies at issue in this case, noting initially that a coverage dispute apparently has arisen as to whether the insurance companies will ever be required to pay under the policies. Each policy includes a $500,000 self-insured retention clause, which applies to each covered "occurrence." The policies define "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Defs.' Rely to Pls.' Resp. to Defs.' Mot. for SummJ.Ex. 1 at 3.* Defendants characterize each instance of abuse taken against any resident living at the Defendant corporations' Texas nursing homes as a single occurrence. The Court, however, is not as confident as Defendants about this interpretation. At best, the policies are ambiguous as to whether the alleged injuries suffered by Mr. Autrey (as well as by the other nursing home residents whose representative are also suing Defendants for abuse) trigger the self-insured retention clause only once, or whether they constitute separate occurrences. The Court also remains uncertain whether allowing nursing home residents to allegedly contract life-threatening infections constitutes an "accident." These issues are therefore subject to dispute. In the end, the Court finds it reasonable to conclude that the availability of Defendants' insurance policies to satisfy any recovery stemming from tortious conduct in the Texas nursing homes run by the Defendant corporations is less than certain. Consequently, Defendants' argument that the insurance policies significantly bolster the overall "capitalization" of Arizona Partners, Inc. and 22 Texas Services, Inc. may be overstated. Nevertheless, the resolution of this dispute waits for another day.

On another level, Defendants have not shown how CCS L.P. or 22 Texas Services, L.P.'s insurance coverage applies to any potential liability attributable directly to Arizona Partners Inc. or 22 Texas Services, Inc. Moreover, Defendants and Plaintiffs offer opposing evidence regarding (1) whether the nature and scope of CCS L.P. and 22 Texas Services, L.P.'s insurance coverage applies to Arizona Partners Inc. and 22 Texas Services, Inc., (2) whether Arizona Partners, Inc. or 22 Texas Services, Inc. secured and paid for the insurance coverage for the nursing homes, and perhaps most importantly (3) whether any of CCS L.P. or 22 Texas Services, L.P.'s insurance coverage would have transformed Arizona Partners, Inc. or 22 Texas Services, Inc. into financially responsible corporate entities. And, to the extent that CCS L.P. and 22 Texas Services, L.P.'s insurance coverage is relevant to the question of whether Arizona Partners, Inc. and 22 Texas Services, Inc. were properly capitalized, the Court remains mindful that even under *Radaszewski* insurance in and of itself is not controlling on the issue, but instead forms a factor for the Court to consider. *Radaszewski,* 981 F.2d at 310. Ultimately, a factual dispute exists about the scope and adequacy of the insurance coverage—one that will be resolved by the jury at trial.

After considering all of Defendants' arguments relating to the evidence upon which Dr. McCoin's "undercapitalization" theory is based, the Court finds that Dr. McCoin's testimony should not be dismissed, provided that his analysis at trial comports with the mandates the Court has outlined above. Consequently, the Court holds that a factual dispute surrounds whether Arizona Partners, Inc. and 22 Texas Services, Inc. were undercapitalized. The question of whether the corporate veils of these companies should be pierced, however, does not end with this conclusion.

### 3. Has an Injustice Occurred?

Having concluded that a material factual issue surrounds whether Arizona Partners, Inc. and 22 Texas Services, Inc. had been undercapitalized, the Court next must consider whether piercing the corporate veil will prevent fraud or injustice. *See Rinck v. Rinck,* 363 Pa.Super. 593, 526 A.2d 1221,

1223 (1987) (permitting a separate corporate entity to be disregarded "whenever it is necessary to avoid injustice"). The Court accepts for the purposes of this summary judgment motion Plaintiffs' argument that Defendants' alleged effort to avoid personal liability by creating sham corporate shields, if proven at trial, constitutes the type of injustice that would satisfy that element of the standard for piercing the corporate veil. Because Plaintiffs' have challenged the legitimacy of Arizona Partners, Inc. and 22 Texas Services, Inc. with a sufficient amount of evidence, the Court rejects, for the time being, Defendants' argument that the corporate veil cannot be pierced as a matter of law. On the other hand, Plaintiffs also have failed to forward enough evidence to conclusively show that the corporate forms should be disregarded. Accordingly, both Defendants' and Plaintiffs' Motions for Summary Judgment as to Piercing the Corporate Veil are **DENIED.**

### C. Have Plaintiffs Offered Evidence Showing that Defendants Should Be Held Individually Liable for Directly Participating in Tortious Conduct?

Referencing *Leitch v. Hornsby*, 935 S.W.2d 114 (Tex.1996), for the proposition that in Texas corporate officers and agents are not subject to individual liability for conduct within the scope of their corporate duties unless they owe a duty to the injured party independent of that owed to the injured party by the corporation, Defendants argue that Plaintiffs have failed to prove that Defendants owed any independent duty to any nursing home residents, including Mr. Autrey. *Id.* at 117. Plaintiffs counter by arguing that the holding in *Leitch* is limited to circumstances in which Plaintiffs fail to show alter ego. *Id.* ("[U]nless alter ego is established, corporate officers and agents are subject to personal liability for their actions within the employment context only when they breach an independent duty of care."). The Court agrees with Plaintiffs and finds that because factual disputes regarding the corporate form of Arizona Partners, Inc.

and 22 Texas Services, Inc. abound, the caveat in *Leitch* applies, at least for the purposes of summary judgment. Consequently, because of the factual issues surrounding the capitalization of the corporate Defendants, there necessarily exists a factual issue concerning whether the Durham Family Defendants may be liable for the neglect and abuse of Mr. Autrey. Accordingly, Defendants' Motion for Summary Judgment as to the individual tortious conduct claims is **DENIED.**

### D. Are Separate Trials Warranted?

Defendants argue that because evidence of insurance coverage would not permit Defendants to obtain a fair trial on the underlying liability issues, the Court should try the Durham Family Defendants separately from the corporate Defendants. While Rule 42(b) of the Federal Rules of Civil Procedure provides that a court may order separate trials, the Court in this instance declines to exercise its authority. Plaintiffs' entire case presents an ubiquitously complex set of facts affecting the liability of all Defendants. Consequently, to separate the parties would be to promote redundant adjudication. However, to allay the Durham Family Defendants' concerns about the insurance coverage issue, the Court will admonish the jury to properly consider such evidence so as to ensure that no Defendants are unduly prejudiced. Accordingly, Defendants' Motion for Separate Trials is **DENIED.**

## IV. CONCLUSION

Because Plaintiffs have set forth evidence that provides a basis for a reasonable jury to pierce the corporate veils of 22 Texas Services, Inc. and Arizona Partners, Inc., the Court finds that Plaintiffs have sustained their burden of proof on jurisdiction and liability for summary judgment purposes—but the issue has not been proven as a matter of law by either side. Given the dispute surrounding whether 22 Texas Services, Inc. and Arizona Partners, Inc. were adequately capitalized, the Court

finds it reasonable to allow a jury to decide the issue. Accordingly, Defendants' Motion for Summary Judgment is **DENIED.**

The parties are also **ORDERED** to file no further pleadings on these issues in this Court, including motions to reconsider and the like, unless justified by a compelling showing of new evidence not available at the time of the instant submissions. Instead, the parties are instructed to seek any further relief to which they feel themselves entitled in the United States Court of Appeals for the Fifth Circuit, as may be appropriate in due course.

**IT IS SO ORDERED.**